**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leroy HENRY, Defendant-Appellant.**

No. 78–5371.

United States Court of Appeals,
Fifth Circuit.

Oct. 16, 1979.

---

Frederick E. Graves, Miami, Fla. (Court-appointed), for defendant-appellant.

A. Scott Miller, Linda C. Hertz, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Circuit Judge, SKELTON, Senior Judge,* and RUBIN, Circuit Judge.

SKELTON, Senior Judge.

Appellant, Leroy Henry, a citizen of Jamaica, was indicted, tried by a jury, and convicted in the United States District Court for the Southern District of Florida for falsely and wilfully representing himself to be a citizen of the United States in violation of 18 U.S.C. § 911.[1] He was sentenced to imprisonment for a period of sixty days. The Appellant has appealed his conviction and sentence to this court. We affirm.

### I. FACTS

On January 18, 1978, the Appellant, Leroy Henry, arrived at Miami International Airport aboard an Air Jamaica flight which had originated in Jamaica. He approached the first immigration inspector, Laura Lee Hankins, and presented both a customs declaration form prepared in the name of Samuel Earl Lymas whose birth date was listed as October 13, 1947, and a birth certificate in the name of Samuel Earl Lymas, who was born on October 13, 1947, at Louise, Mississippi. The Appellant was, however,

---

* Senior Judge of the United States Court of Claims, sitting by designation.

1. 18 U.S.C. § 911 provides as follows:

"Whoever falsely and willfully represents himself to be a citizen of the United States shall be fined not more than $1,000 or imprisoned not more than three years, or both." June 25, 1948, c. 645, 62 Stat. 742.

unable to answer Ms. Hankins' inquiry as to the location of the city of Louise, Mississippi, and Ms. Hankins noticed that, in the space provided on the declaration form for stating the country of citizenship, there appeared the letters "JAM", which had been crossed out with the designation "U.S." inserted next to it. In addition, she recognized that the Appellant spoke with a foreign accent. Because Ms. Hankins suspected that he was not the person he represented himself to be, she referred him to a waiting room to speak with a second immigration inspector. She did not speak to the second inspector. At no time during her questioning did Ms. Hankins advise the Appellant of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Inspector Hankins transferred the Appellant to a second immigration officer, Kathy Sheehan, who was assigned to the secondary inspection area, where people not readily admissible during primary inspection are sent for a more detailed inspection so as not to interfere with the flow of traffic through the primary inspection lines. After reviewing documents left for her inspection, i. e. the customs declaration, birth certificate, and a one-way airline ticket from Jamaica, Ms. Sheehan spoke with the Appellant and requested that he state his true name and place of birth. He stated that he was Samuel Lymas and that he was born in the United States of America. After a search of his baggage by a customs inspector, the Appellant was again asked his name by inspector Sheehan and he stated that his name was Williston Smith and that he was born in Jamaica. Ms. Sheehan then began the paperwork on a report preparatory to sending the Appellant downtown to the district office, and again asked him his correct name. This time he stated that he was Leroy Henry and that he was born in Jamaica in 1947. He was not questioned further by Ms. Sheehan. After the Appellant had completed this interview with Ms. Sheehan, he was escorted from her office by representatives of Air Jamaica, who were responsible for taking him to the office of Mr. Reissig of the Immigration and Natu-

ralization Service. During her questioning, Ms. Sheehan did not give the Appellant a "*Miranda* warning." She later testified that at the time of her questioning the Appellant was not free to go.

The Appellant testified at his trial that Ms. Sheehan attempted to compel him to cooperate by both threatening him with a long jail sentence and by promising him that he would be returned to Jamaica. This was denied by Ms. Sheehan.

The next morning, January 19, 1977, the Appellant was brought to the office of Investigator Reissig by a guard service used by Air Jamaica. This was the first contact Investigator Reissig had with the Appellant. He was not present when Ms. Sheehan questioned Appellant. However, Ms. Sheehan sent a report of her questioning of Appellant to Reissig who read it before seeing the Appellant. Sheehan did not talk to Reissig. When the Appellant arrived at Reissig's office, Reissig placed a printed form containing *Miranda* warnings in front of the Appellant after first ascertaining that he could read and write. The Appellant told him that he understood the rights he had read. Reissig also orally told the Appellant that he did not have to tell Reissig anything, that he could have a lawyer present to advise him, and that the information could be used against him if he decided to make a statement. Investigator Reissig testified at the trial that he made no promise of any special benefits or advantages to Appellant to induce him to make a statement. After Reissig fully advised the Appellant of his rights, he placed him under oath and took his statement with a stenographer present.

In that statement, the Appellant admitted that his true and correct name was Leroy Henry, that he was born in St. Ann's on May 15, 1947, and that he was a citizen of Jamaica. He further admitted that the birth certificate from the State of Mississippi, with the name of Samuel Earl Lymas on it, was given to him by a good friend whose name was Mungo. The Appellant also admitted that he had never been to Mississippi or to the United States before, and had

never applied for a visa with the American Consulate in Kingston, Jamaica.

After giving this sworn statement, the Appellant was placed under arrest. A copy of his Jamaican birth certificate was obtained subsequent to his giving the statement.

In his testimony at the trial, the Appellant said that he was never advised of his *Miranda* rights by Mr. Reissig or anyone else, and that the only reason that he made the statement and signed it was because of Mr. Reissig's promises, assurances and threats. All of this testimony was contradicted by Mr. Reissig. The jury chose to believe Mr. Reissig and the other Government witnesses, and convicted the Appellant.

At the beginning of the trial, Appellant filed a motion for continuance, which was denied. Thereafter, on the second day of the trial, he filed a motion to suppress the inculpatory statements he had made to the immigration officials. The trial judge heard evidence and argument on the motion and then denied it.

II. The First Immigration Inspector Was Not Required To Give The Appellant A *Miranda* Warning Prior To Nor During Her Questioning Of Him.

The Appellant contends that he should have been given the *Miranda* warning and explanation of his rights by the first immigration inspector, either prior to or during her interrogation of him, and that her failure to do so rendered his later inculpatory statement inadmissible at the trial. We do not agree.

The Government argues that an alien, such as the Appellant, "standing at the border" and seeking entry into the country, does not enjoy the same rights in criminal proceedings that are accorded to aliens who are already in the country, legally or illegally, and, therefore, the Appellant did not have a right to a *Miranda* warning prior to or during his interview with the first inspector. This contention is based on the Federal Government's right to exclude aliens and otherwise control and regulate their entrance into the country.[2]

The cases relied on by the Government in support of its position involved deportation, exclusion or social benefit proceedings of aliens and were not criminal cases.[3]

The courts have held that those kinds of cases are not criminal in nature.[4] Consequently, they would not control the disposition of the case before us.

It is well settled that the Federal Government has control over the entrance of aliens into this country. The Supreme Court, in the case of *Lem Moon Sing v. United States*, 158 U.S. 538, 15 S.Ct. 967, 39 L.Ed. 1082 (1895), stated this principle of law as follows:

" . . . [A]ccording to the accepted maxims of international law, every sovereign nation has the power, inherent in sovereignty and essential to self preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such condition as it may see fit to prescribe . . "

・ ・ ・ ・ ・

2. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); 8 U.S.C.A. § 1101, et seq.

3. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950) (Involved the exclusion of an alien); *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (Involved the exclusion of an alien); *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (Involved the eligibility of an alien for Medicare Supplemental Medical Insurance); *Petition of Cahill*, 447

F.2d 1343 (2 Cir. 1971) (An alien who was detained pending determination of his status filed a writ of habeas corpus petition requesting parole or bail; the writ was denied.)

4. *Zakonaite v. Wolf*, 226 U.S. 272, 33 S.Ct. 31, 57 L.Ed. 218 (1912); *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952); *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *Woodby v. Immigration & Naturalization Service*, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966); *Chavez-Raya v. Immigration & Naturalization Service*, 519 F.2d 397 (7 Cir. 1975).

"The power of congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through the executive officers, without judicial intervention, is settled by our previous adjudications. 158 U.S. at 547, 15 S.Ct. at 970, 39 L.Ed. at 1085."

■ Pursuant to its power to regulate the admission and exclusion of aliens, the Federal Government has provided in its immigration laws different requirements for aliens already in the country to those seeking admission. See 8 U.S.C.A. §§ 1226 and 1251. As a result, it has been held that under these laws the rights of aliens who are already in the country are different from the rights of aliens seeking admission at the border (i. e., standing at the border). *Leng May Ma v. Barber*, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958). In the *Leng May Ma* case, the Supreme Court stated:

"It is important to note at the outset that our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.' *Shaughnessy v. United States*, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956, 963 (1953). See *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576, 583 (1953)." 357 U.S. at 187, 78 S.Ct. at 1073, 2 L.Ed.2d at 1248.

While, in that case the Supreme Court distinguished between the rights of aliens in the country and those at the border seeking admission with respect to immigration laws and deportation and expulsion proceedings, it did not consider the question of their differing rights in criminal proceedings.

In the early Supreme Court case of *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), the question of an alien's rights in a criminal proceeding was considered. In that case, a Chinese alien was found to be unlawfully within the United States and was sentenced to be imprisoned for 60 days at hard labor in a summary hearing without the benefit of a judicial trial. After the expiration of the sentence, the alien was to be deported.[5]

Although the court recognized the right of the United States to regulate and control the entrance of aliens into the country and to declare the act of an alien remaining unlawfully in the country an offense, it added that:

"So, too, we think it would be plainly competent for congress to declare the act of an alien in remaining unlawfully within the United States to be an offense punishable by fine or imprisonment, *if such offense were to be established by a judicial trial*." 163 U.S. at 235, 16 S.Ct. at 980, 41 L.Ed. at 142. (Emphasis supplied).

In the instant case the Appellant was afforded a judicial trial for the offense charged. However, he contends that his Fifth Amendment rights were violated by the admission into evidence of his statements made during his interrogations by the first and second inspectors and before he was given a *Miranda* warning, as well as subsequent statements he gave Investigator Reissig after the warning was given. The Government, on the other hand, contends that the Appellant, an alien at the border, had no right to a *Miranda* warning prior to or during the interviews with the first and second inspectors. The Fifth Amendment, upon which the *Miranda* warning require-

---

**5.** The alien was convicted for a violation of § 4 of the Act of May 5, 1892, which stated:

"That any such Chinese person or person of Chinese descent convicted and adjudged to be not lawfully entitled to be and remain in the United States shall be imprisoned at hard labor for a period of not exceeding one year and thereafter removed from the United States, as hereinbefore provided."

ment is based, states, in pertinent part, as follows:

" . . . No person shall be compelled in any criminal case to be a witness against himself."

It does not say "no *citizen* shall" (emphasis supplied), which would, of course, limit its application.

Regarding the application of the Fourteenth Amendment to aliens, the Supreme Court, in the case of *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), said:

"The [14th] Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any difference of race, of color, or nationality; and the equal protection of the laws is a pledge of the protection of equal laws." 118 U.S. at 369, 6 S.Ct. at 1070, 30 L.Ed. at 226.

Following the rationale in the *Yick Wo* case, the Supreme Court in *Wong Wing*, *supra*, stated:

"Applying this reasoning to the 5th and 6th Amendments, it must be concluded that *all persons within the territory of the United States are entitled to the protection guaranteed by those amendments,* and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law." (Emphasis supplied). 163 U.S. at 238, 16 S.Ct. at 981, 41 L.Ed. at 143.

■ Therefore, an alien who is within the territorial jurisdiction of this country, whether it be at the border or in the interior, in a proper case and at the proper time, is entitled to those protections guaranteed by the Fifth Amendment in criminal proceedings which would include the *Miranda*

warning. *Wong Wing v. United States, supra; United States v. Casimiro-Benitez,* 533 F.2d 1121 (9 Cir. 1976), *cert. denied,* 429 U.S. 926, 97 S.Ct. 329, 50 L.Ed.2d 295 (1976).

■ It is clear from these authorities that Appellant, an alien at the border, was entitled to the rights guaranteed by the Fifth Amendment, including the *Miranda* warning, only when the questioning of the immigration officials became an interrogation that was custodial in nature in which information was sought for the purpose of using it against him in a criminal proceeding. This did not occur during the questioning by the first inspector, as will be discussed more specifically below.

The Supreme Court in its landmark decision of *Miranda v. Arizona, supra,* stated the general principle for which the case stands, as follows:

" . . . the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444, 86 S.Ct. at 1612.

■ In formulating this principle of law, the court placed special emphasis on the "compulsion inherent in custodial surroundings", and, as a result, based the *Miranda* rule on this "compulsion" theory by saying:

"We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains *inherently compelling pressures* which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." 384 U.S. at 467, 86 S.Ct. at 1624. (Emphasis supplied).

See also *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). It is, therefore, the compulsive or coercive aspects of a custodial situation which triggers the *Miranda* requirement and not the Government's suspicions nor the subject matter of the interview. *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Barfield v. Alabama,* 552 F.2d 1114 (5 Cir. 1977).

The *Miranda* requirement is not, of course, applicable to every situation where law enforcement officers are asking questions. The court in *Miranda* stated that the requirements established by the ruling are not applicable to "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process" because the "compelling atmosphere inherent" in custodial interrogations is not "necessarily present." 384 U.S. at 477, 86 S.Ct. 1629 and 478, 86 S.Ct. 1602.

As a corollary of this exception to the *Miranda* requirements, the Fifth Circuit has held that *Miranda* warnings are unnecessary during routine questioning and searches by customs agents and during a routine boarding and inspection of an American vessel on the high seas by the Coast Guard. *United States v. Martinez,* 588 F.2d 495 (5 Cir. 1979); *United States v. One (1) 1963 Hatteras Yacht Ann Marie,* 584 F.2d 72 (5 Cir. 1978); *United States v. Warren,* 578 F.2d 1058 (5 Cir. 1978); *United States v. Smith,* 557 F.2d 1206 (5 Cir. 1977), *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978); *United States v. Thompson,* 475 F.2d 1359 (5 Cir. 1973).

Based, therefore, on the foregoing, we hold that a *Miranda* warning need not be given by immigration officials to a person entering the United States, unless and until the questioning of the officials becomes an interrogation that is custodial in nature in which information is sought for the purpose of using it against such person in a criminal proceeding. *Miranda, supra; Chavez-Martinez v. United States,* 407 F.2d 535 (9 Cir. 1969), *cert. denied,* 396 U.S. 858, 90 S.Ct. 124, 24 L.Ed.2d 109 (1969).

The Ninth Circuit Court held in *Chavez-Martinez, supra:*

"We hold that the warning required in *Miranda* need not be given to one who is entering the United States unless and until the questioning agents have probable cause to believe that the person questioned has committed an offense or the person questioned has been arrested, whether with or without probable cause. It is at that point, in border cases, that the investigation has 'focused' in the *Miranda* sense."

The primary question remaining with respect to Ms. Hankins' questioning is whether or not the Appellant was "in custody" for *Miranda* purposes during the first interview. In determining the "custody" issue, this court has adopted the judicial approach of deciding the issue on a case-by-case basis. *United States v. Warren, supra; United States v. Carollo,* 507 F.2d 50 (5 Cir. 1975), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1975); *Alberti v. Estelle,* 524 F.2d 1265 (5 Cir. 1975), *cert. denied,* 426 U.S. 954, 96 S.Ct. 3181, 49 L.Ed.2d 1193 (1976); *Brown v. Beto,* 468 F.2d 1284 (5 Cir. 1972); *United States v. Montos,* 421 F.2d 215 (5 Cir. 1970), *cert. denied,* 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). This court utilizes the following test in determining whether an interrogation occurred in a custodial situation: (1) probable

cause to arrest; (2) subjective intent of the law-enforcement officer; (3) subjective belief of the defendant; and (4) the focus of the investigation. *United States v. Warren, supra; United States v. Carollo, supra; Alberti v. Estelle, supra; Brown v. Beto, supra; United States v. Montos, supra.*

Each requirement of the test will be considered as follows:

(1) Probable Cause.

The first prerequisite is whether probable cause to arrest had arisen. Probable cause for an arrest exists "if the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed." *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959); *Stacey v. Emery,* 97 U.S. 642, 24 L.Ed. 1035. In the instant case, Ms. Hankins, the first immigration official to interview the Appellant, testified that the Appellant presented her with a customs declaration form and a birth certificate both in the name of "Samuel Earl Lymas." The Appellant was not able to answer Ms. Hankins' questions concerning the location of Louise, Mississippi (i. e., the birthplace stated in the birth certificate). Ms. Hankins also noticed that the Appellant spoke with a foreign accent and that, in the space provided on the declaration form for the country of citizenship, the letters "JAM" appeared which had been crossed out and the letters "U.S." inserted next to it. Admittedly, Ms. Hankins testified that she had reason to believe that the Appellant was a Jamaican and that he was not Samuel Earl Lymas; however, she added that she was not certain but only suspected it. She went on to testify that she was "pretty sure" he was not a United States citizen, although she was not certain. Was there probable cause to arrest the Appellant at this point? We think not. Suspicion and even "strong reason to suspect" is not adequate to establish probable cause. *Henry v. United States, supra.* Title 18 U.S.C. § 911 makes it an offense for one who "falsely and willfully represents himself to be a citizen of the United States." Clearly, the presentation of a false birth certificate by an alien as evidence of asserted citizenship would constitute a violation of this statute. *United States v. Rodriguez Serrate,* 534 F.2d 7 (1 Cir. 1976).

Although, as it finally turned out, Appellant's action constituted an offense, Ms. Hankins did not have sufficient facts before her to cause her to have anything more than a mere suspicion that an offense may have been committed. Speaking with a foreign accent is not always indicative of nationality or citizenship. Ignorance of geography is much too commonplace to be given any weight in such a situation as here presented. The crossed-out letters "JAM" could too easily be explained as a mental error of one completing forms when he attempts to insert the country of residence, or the country from whence he came, in the space provided for country of citizenship. There was no evidence that the Miami Airport was a "suspicious place" where many illegal aliens from Jamaica were attempting to enter the United States; that Ms. Hankins knew the Appellant was a Jamaican citizen; that she had observed him in the past entering the country or attempting to do so; or that he acted in a suspicious manner, thus establishing probable cause. See *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *United States v. Casimiro-Benitez, supra.* In fact, the only evidence tending to establish probable cause during the primary inspection was the presence of Appellant who spoke with a foreign accent, who was not familiar with the geography of Mississippi, and who made an error on his declaration form. Although these circumstances were clearly sufficient to arouse the suspicions of the first inspector and to warrant further inquiry into the Appellant's status, they were not sufficient to establish probable cause for an arrest.

In the case of *United States v. Smith,* 557 F.2d 1206 (5 Cir. 1977), *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978), the facts were similar to the facts in this case. In that case, the Appellant Smith arrived at Miami International Airport from Bogota, Colombia. Upon entering the

customs line and in response to questions asked by a customs agent, he stated that he had been on a four-day vacation and that he was an unemployed truck driver with a wife and child. The customs agent noticed that Smith became very nervous and very pale during the questioning and that he fit a "smuggling profile," (i. e., arrival from Colombia, one suitcase, no items to declare for customs, travelling alone, and claiming to have been on a vacation.) The court held that although the customs agent had sufficient facts before him to make him suspicious, he did not have sufficient facts to establish "probable cause" for an arrest which would have required him to give Smith the *Miranda* warning at that point. Even though Smith looked like a smuggler (i. e., fit smuggler's profile and was nervous), there was no probable cause to arrest or to require the giving of a *Miranda* warning unless and until smuggled goods were discovered. Comparing the facts in that case with those in the case before us, we find that Appellant appeared unlike a United States citizen to the first inspector (i. e., foreign accent, no knowledge of Mississippi geography and the marked-out letters on the declaration form), but there was no probable cause to arrest him during that interrogation. The old saying that "you cannot judge a book by its cover" would certainly apply here. See also, *United States v. Forbicetta*, 484 F.2d 645 (5 Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974).

### (2) Subjective Intent of Officer.

The second principle is whether the subjective intent of the interrogating officer was to hold the Appellant in custody. The questioning of the Appellant by the primary inspector Ms. Hankins was done in accordance with the applicable immigration laws and regulations. 8 U.S.C.A. §§ 1225 and 1357; 8 C.F.R. 235.1, *et seq.*[6]

The inquiry by Ms. Hankins cannot be characterized as anything more than rou-

**6.** 8 U.S.C.A. § 1225 provides in pertinent part as follows:

"§ 1225. Inspection by Immigration Officers—Powers of officers.

(a) The inspection, other than the physical and mental examination, of aliens (including alien crewmen) seeking admission or readmission to or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe. Immigration officers are authorized and empowered to board and search any vessel, aircraft, railway car, or other conveyance, or vehicle in which they believe aliens are being brought into the United States. The Attorney General and any immigration officer, including special inquiry officers, shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through or reside in the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service, and, where such action may be necessary, to make a written record of such evidence. Any person coming into the United States may be required to state under oath the purpose or purposes for which he comes, the length of time he intends to remain in the United States, whether or not he intends to remain in the United States, permanently and, if an alien, whether he intends to become a citizen thereof, and such other items of information as will aid the immigration officer in determining whether he is a national of the United States or an alien and, if the latter, whether he belongs to any of the excluded classes enumerated in section 1182 of this title. . . .

(b) Detention for further inquiry; challenge of favorable decision.

Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 1323(d) of this title, who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry."

8 U.S.C.A. § 1357 provides, in pertinent part, as follows:

"§ 1357. Powers of immigration officers and employees—Powers without warrant.

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

tine administrative questioning. It certainly was not a criminal investigation. Obviously, the subjective intent of Ms. Hankins was to determine the Appellant's eligibility to enter the United States, and, as a result, his freedom was somewhat restricted until his eligibility was established. The Appellant was not yet free to enter the country and he had to remain in the care of the officials of the airline that brought him here until he was admitted by the immigration inspectors. 8 C.F.R. § 235.3(a), *supra.*

The questioning of the Appellant by Ms. Hankins was nothing more than the same

> (1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
> (2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, or expulsion of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States; . . . ."

> "Administration of oath; taking of evidence
> (b) Any officer or employee of the Service designated by the Attorney General, whether individually or as one of a class, shall have power and authority to administer oaths and to take and consider evidence concerning the privilege of any person to enter, reenter, pass through, or reside in the United States, or concerning any matter which is material or relevant to the enforcement of this chapter and the administration of the Service; and any person to whom such oath has been administered (or who has executed an unsworn declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of Title 28), under the provisions of this chapter, who shall knowingly or willfully give false evidence or swear (or subscribe under penalty of perjury as permitted under section 1746 of Title 28) to any false statement concerning any matter referred to in this subsection shall be guilty of perjury and shall be punished as provided by section 1621 of Title 18."
> The Regulations of the Immigration and Naturalization Service provide, in pertinent part:

interrogation that is made every day of many people seeking admission to the United States, and was, therefore, routine. *United States v. Salinas,* 439 F.2d 376 (5 Cir. 1971); *United States v. McCain,* 556 F.2d 253 (5 Cir. 1977).

We conclude that there was no subjective intent on the part of the first inspector to hold the Appellant in custody.

### (3) Subjective Belief of the Appellant

The third element is whether the subjective belief of the Appellant was that his

> "§ 235.3 Detention.
> (a) *Prior to inspection.* All persons arriving at a port in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the master, commanding officer, purser, person in charge, agent, owner, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to so detain shall not be required.
> (b) *Detention after inspection.* If in the opinion of the examining immigration officer it is not practical to resolve a question of admissibility at the time of arrival of a passenger on a vessel or aircraft, the officer shall execute Form I–259 to notify the agent for the vessel or aircraft and the master or commanding officer, if available, that the passenger is to be presented for further inspection. The Form I–259 shall list the name of each such passenger and shall contain instructions as to the date and place the passenger is to be presented for continued inspection or further proceedings under the Act. If the place specified is a designated port of entry to which the transportation company has carried or has contracted to carry the passenger, the transportation company shall remain under the obligation, described in the preceding paragraph, to prevent an unauthorized landing, unless the transportation company has been relieved of such obligation by removal under section 233(a) at the direction of the Service or unless the Service has paroled the alien under section 212(d)(5) of the Act without directing the carrier in writing to present the alien for further inspection. The term port of entry as used in this paragraph includes a Service district office or suboffice within the city or town or in local commuting distance of the seaport or airport at which the passenger arrived or of the onward seaport or airport specified by the examining immigration officer as the place for completion of inspection." [32 FR 9628, July 4, 1967, as amended at 34 FR 14727, Sept. 24, 1969].

freedom was significantly restricted. The record contains no clues concerning the Appellant's belief about his freedom during the first inspection. Since the questioning of Appellant and his detention during this inspection were routine, we find that the Appellant should not have felt coerced, or that his freedom was significantly restricted during the first interview.

### (4) Focus of the Investigation.

 The fourth and final requirement is whether the investigation had focused on the Appellant at the time of the first interview. Since this case involves a border situation, those special rules concerning border questioning are considered at this point. As a general rule, routine questioning and searches at the border do not place a person "in custody" within the meaning of *Miranda*. *United States v. McCain, supra*; *United States v. Garcia*, 496 F.2d 670 (5 Cir. 1974), *cert. denied*, 420 U.S. 960, 95 S.Ct. 1347, 43 L.Ed.2d 436 (1975); *United States v. Salinas, supra*. Judge Bell in *Salinas* stated the general rule as follows:

> "Thousands of persons enter the country daily and are subject to some degree of detention while their luggage is searched and they are asked routine questions concerning citizenship, destination, whether they have items to declare, questions regarding contraband, and the like. To hold that questioning of these types or routine border searches of luggage place a person "in custody" within the meaning of *Miranda* would unduly distort that case. *Chavez-Martinez v. United States*, 9 Cir., 1969, 407 F.2d 535; and see also *United States v. Kurfess*, 7 Cir. 1970, 426 F.2d 1017. However, when the border search or detention becomes more than routine, such as when a person is discovered to be concealing suspicious materials, or when a person is taken to a private room and strip searched as here, a different outcome obtains. *United States v. De La Cruz*, 7 Cir., 1970, 420 F.2d 1093; *United States v. Berard*, D.C.Mass., 1968, 281 F.Supp. 328." 439 F.2d at 379, 380.

In *Garcia, supra*, the defendant was subjected to a complete strip search and detained for at least an hour for questioning afterwards. This court stated:

> "It is obvious that the governmental activity revealed here was more than 'routine.' . . . Under the Salinas standard, she [the defendant] was subjected to a custodial interrogation. . . ." 496 F.2d at 672, 673.

The *Garcia* case is clearly distinguishable on the facts from those in the instant case, insofar as they relate to an interrogation by a government official. Here, questions asked of Appellant by the first inspector were routine and confined generally to identity, citizenship, and destination. The Supreme Court held in *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), that disclosure of one's identity is not a self-incriminating act. See also, *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927).

One arriving at the border could expect to be asked about his citizenship and destination. There is nothing custodial about such general questions.

It is clear that the investigation had not focused on the Appellant at the time of the first inspection.

 We hold that the Appellant was not "in custody" during his interrogations by the first inspector. We hold further that the questions asked by such inspector were routine and non-custodial. The questions she asked were fully authorized by the statutes and the regulations. Accordingly, she was not required to give the *Miranda* warning to Appellant prior to or during her interrogation of him. Consequently, the trial court did not err in refusing to suppress the answers of Appellant to Ms. Hankins' questions.

### III. The Interrogation of Appellant By The Second Inspector

The Appellant contends that he should have been given a *Miranda* warning no later than the conclusion of the first inspector's questioning, and that, consequently,

the second immigration inspector's questioning occurred while he was "in custody" for criminal prosecution purposes.

■ The referral of a person entering this country to a secondary inspector is part of the "routine" border interrogation and does not, in and of itself, focus on the person so as to require a *Miranda* warning. See *United States v. Martinez, supra*; *United States v. Garcia, supra*; *Chavez-Martinez v. United States, supra*; *United States v. Smith, supra*. Accordingly, under the fact situation here, the investigation had not "focused" on the Appellant so as to require a *Miranda* warning when he was first referred to the second inspector. The purpose of Ms. Sheehan's investigation in the beginning was to obtain sufficient facts to determine if he was eligible to enter the United States. Therefore, at first, her questioning was merely "routine" and did not focus on Appellant until he admitted that he was born in Jamaica. When he made this admission, the nature of the interrogation changed from routine questioning to a custodial investigation that required the second inspector to give Appellant the *Miranda* warning before asking him any more questions. She did not give him such a warning, but proceeded to ask him additional questions. She asked him his correct name three different times. The first time he answered that his name was Samuel Earl Lymas. The second time he said his name was Williston Smith, and the third time he admitted that his correct name was Leroy Henry. After getting this information, Ms. Sheehan pressed him for an admission as to his true citizenship, and he finally said he was a citizen of Jamaica. Ms. Sheehan then prepared a written report of her interview with Appellant and sent it downtown to Investigator Reissig. She ordered a guard of Air Jamaica to take the Appellant to Investigator Reissig's office for further questioning.

It is clear that when Appellant admitted to the second inspector that he was born in Jamaica, the investigation focused on Appellant as a criminal suspect. At that time there was probable cause to arrest him.

Thereafter, the second inspector asked questions of Appellant for the purpose of using his answers against him in a criminal proceeding. She had the subjective intent to hold him for that purpose.

■ We hold that when Appellant admitted that he was born in Jamaica he was thereafter in custody within the meaning of *Miranda*, and that all statements he made thereafter to the second inspector should have been suppressed by the trial court. However, this error does not require a reversal of the case for reasons pointed out below.

IV. Appellant's Sworn Confession

When Inspector Sheehan finished the second interview with Appellant, she wrote a report about it and sent it to Investigator Reissig. He read the report before he questioned the Appellant. This report is not in the record, so we do not know what it contains. However, we can assume that it described the results of the second interrogation conducted by Ms. Sheehan. Armed with the information contained in this report, Reissig gave the Appellant a proper *Miranda* warning, placed him under oath and proceeded to question him. The Appellant confessed that his name was Leroy Henry, and not Samuel Earl Lymas, that he was born in Jamaica and was a citizen of that country and not of the United States. He stated further that the Lymas birth certificate he presented to the immigration officials had been given to him by a friend. He said that he understood his rights and did not want a lawyer. He signed a printed form waiving his constitutional rights.

The Appellant argues that the confession obtained by Reissig was "tainted" by prior unconstitutional questioning of him by the second inspector. In this connection, Appellant says in his brief:

"Assuming, ad arguendo, that the defendant was properly advised of his rights by Investigator Reissig, such belated warnings came too late for an intelligent waiver of constitutional rights. See *Miranda v. Arizona*, supra, [384 U.S. at 496, 86 S.Ct. 1602]. It is a well estab-

lished rule that subsequent in-custody statements will be inadmissible if a causal connection is found between prior unconstitutional conduct and the subsequent statement. The subsequent confession is said to be tainted by the prior misconduct. *Harney v. United States*, 407 F.2d 586 (5 Cir. 1969); *Gilpin v. United States*, 415 F.2d 638 (5 Cir. 1969); *Albert[i] v. Estelle*, 524 F.2d 1265 (5 Cir. 1975), *cert. denied*, 426 U.S. 954, [96 S.Ct. 3181, 49 L.Ed.2d 1193]; *Randall v. Estell[e]*, 492 F.2d 118 (5 Cir. 1974); *Smith v. Estelle*, 527 F.2d 430 (5 Cir. 1976)."

We think that this is a correct statement of the law and that it is applicable to our case. It is uncontroverted that Reissig read the report of Inspector Sheehan about her interrogation of Appellant before Reissig questioned him. Reissig was "armed" with that information before he gave Appellant the *Miranda* warning and began questioning him. The information that Reissig obtained from Appellant was, for all practical purposes, the same evidence developed by Inspector Sheehan without a *Miranda* warning. There was a definite causal connection between the two interrogations. This court stated in *Gilpin v. United States*, 415 F.2d 638, 641–642 (1969):

"Our inquiry cannot stop here. The record indicates that Gilpin was given adequate *Miranda* warnings before his later confessions, but as the Supreme Court stated in *United States v. Bayer*, 1946, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654, 1660:

'Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag.'

The Supreme Court, however, in *Westover v. United States*, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, pointed out that when there are multiple confessions, the lack of a proper warning before the first in-custody statement does not necessarily render inadmissible statements during interrogation after appropriate warning. The facts and circumstances of each case must be examined to determine the existence and extent of a causal relationship between the earlier unconstitutional conduct and the later statement.

This Court in *Harney v. United States*, 5 Cir., 1969, 407 F.2d 586, adhered to the Supreme Court's direction as set down in *Westover*. Harney had also made in-custody statements and confessions on several occasions. Because he had not been given adequate *Miranda* warnings, the trial court suppressed earlier statements, including the first written confession. However, the trial court, admitted Harney's later confession after a proper *Miranda* warning had been related to him. This Court, in reversing the trial court, held that when the 'appellant reiterated to the FBI agent what he already had told twice, and one of those times in writing, the effects of the earlier invalid interrogations and statements had not been sufficiently dissipated, and the FBI agent was the direct beneficiary of the illegal conduct of the local police.' 407 F.2d at 590.

The second postal inspector 'entered the fray armed with defendant's earlier admissions.' *Pierce v. United States*, [*United States v. Pierce*] 4 Cir. 1968, 397 F.2d 128, 131. It came at what to Gilpin could seem only the end not the beginning of the interrogation process.

Here, as in *Harney*, Gilpin knew that 'the cat was out of the bag.' One confession led to another. The effect of the tainted confession was not dissipated by the time of the next confession. A belated adequate warning could not put the cat back in the bag."

In the instant case, as in *Harney, supra*, the Appellant knew that the "cat was out of the bag" by his admissions to Inspector Sheehan as to his real identity, birthplace and citizenship. The warning by Reissig could not "put the cat back in the bag." One confession led to another. Under these circumstances, Appellant's confession to

Reissig should have been suppressed and it was error to admit it into evidence. However, this error does not require the case to be reversed for reasons stated below.

Even if Appellant's admissions to Inspector Sheehan and his confession to Investigator Reissig had been suppressed, there remained overwhelming evidence as to his guilt beyond a reasonable doubt. This evidence consisted generally of the following facts. The Appellant has appeared in this court as Leroy Henry. By doing so he admits and represents to the court that his true identity is Leroy Henry and not Samuel Earl Lymas. It is uncontroverted that he appeared before inspector Hankins and presented a customs declaration which stated that he was Samuel Earl Lymas. This has been shown to be false, as he is not Lymas. Also, the declaration and birth certificate of Lymas he presented showed that he was born in Mississippi. These were false representations, since he was not Lymas. Furthermore, his birth certificate that the Government obtained from Jamaica showed that he was born in that country. Appellant complains that his birth certificate was "tainted" by his illegal admissions to officers Sheehan and Reissig. This argument is unpersuasive. No casual connection has been shown between such admissions and the obtaining of the birth certificate. Appellant's plane ticket showed that he came from Jamaica on Air Jamaica. He spoke to the first inspector with a Jamaican accent. Jamaica is a small country and apparently maintains a central office for births occurring in the whole country, as his birth certificate shows that it was obtained from the office of Registrar General of Jamaica. Under these circumstances, it was logical that the Government would seek his birth certificate in Jamaica entirely independent of Appellant's admissions to the officers.

■ In any event, even if it were error to introduce Appellant's Jamaican birth certificate into evidence, it was harmless error. Appellant admits in his brief that he is an alien and that he is in the United States illegally. He claims Fifth Amendment rights as an alien. Title 18 U.S.C. § 911 is not limited to aliens from Jamaica, but applies to any person, including the Appellant, who falsely represents himself to be a citizen of the United States.

■ We hold that the admission into evidence of said statements made by Appellant to the second inspector and to Investigator Reissig was harmless error beyond a reasonable doubt in view of other evidence which showed overwhelmingly that Appellant was guilty of violating the statute. See *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

We do not find it necessary to consider other arguments made by Appellant.

Accordingly, Appellant's conviction is affirmed.

AFFIRMED.