**UNITED STATES of America, Plaintiff,**

v.

**Amado FERNANDEZ VENTURA and Milagros Cedeño, Defendants.**

Crim. No. 94–364 (JAF).

United States District Court,
D. Puerto Rico.

June 30, 1995.

**364**

Asst. U.S. Atty. Antonio R. Bazan, Guillermo Gil, U.S. Atty., D. Puerto Rico, San Juan, PR, for plaintiff.

Linda Backiel, Gregorio Lima, San Juan, PR, for defendants.

### OPINION AND ORDER

FUSTÉ, District Judge.

### I.

#### Introduction

Defendants, Amado Fernández Ventura and Milagros Cedeño, request that we suppress inculpatory statements made in the absence of *Miranda* warnings while defendants were subject to secondary Customs inspection and interrogation. We conclude that the defendants' statements were made after their rights to silence and counsel had attached and while subject to custodial interrogation; accordingly, we suppress the inculpatory testimonial evidence procured thereby. We also conclude that defendants would violate the 31 U.S.C. § 5324(b)(3) (1988) prohibition against structuring an illegal importation of monetary instruments if, while aware of the declaration requirement and/or antistructuring laws, they failed to declare money carried across the border, the sum of which money they knew to exceed the declaration requirement, and which money they also knew belonged to a single person or entity.[1]

### II.

#### Facts

Defendant Fernández' frequent travel between Saint Maarten, N.A., and Puerto Rico triggered a computerized advisement that placed Customs officers on lookout for him as he deplaned at San Juan International Airport. Customs officers had noticed his name in an American Airlines passenger list for a flight arriving from the Netherlands Antilles that day. When the flight arrived, a roving Customs inspector was sent to bring Fernández to secondary inspection as soon as he deplaned and had cleared Immigration. As he cleared Immigration, Fernández was ac-

---

1. Pursuant to 31 U.S.C. § 5316 (1988) and 31 C.F.R. § 103.23, the possession of more than $10,000 in currency or its equivalent must be declared at U.S. Customs when leaving or arriving the United States.

costed and immediately taken to the secondary inspection tables. At secondary inspection, Fernández was asked whether he was carrying any money; he replied that he was carrying $8,000. During the accompanying legal, routine border search, Customs officers found women's lingerie in his suitcase. Customs officers asked Fernández to whom the lingerie belonged. When he stated that it belonged to "mi mujer", Customs officers asked him to direct them to codefendant Cedeño, the woman to whom the defendant had referred.[2]

Cedeño had already cleared Customs, but was still within the Customs enclosure when she was brought back for interrogation at secondary inspection. While walking to the inspection area, Customs Inspector Fisher asked Cedeño if she was carrying any money. She answered that she was carrying approximately $9,000.[3] Upon searching the defendants, officers found them to be jointly in the possession of $16,166, amounting to $6,166 above the limit beyond which declaration is required under 31 U.S.C. § 5316 (1988) and 31 C.F.R. § 103.23 (1994). Officer Alvino then asked Fernández whether the money belonged to him. He stated that the money belonged to his money exchange company. The officer then asked whether defendant was president of the company. When Fernández replied that he was, in fact, president of the company to which the money belonged, the officers placed him under arrest for false representations and failure to declare.

In count one, the government charges both defendants with failure to declare as required by 31 U.S.C. § 5316 (1988). In counts two and three, the government charges the defendants each with making a false, fictitious or fraudulent representation to the U.S. Cus-

toms Service, in violation of 18 U.S.C. § 1001 (1988).[4]

Defendants now request that we suppress, as having been taken without the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), all statements made by them after officers began to investigate the ownership of the lingerie found in Fernández' possession. Defendants also assert that, because Cedeño is only the employee and girlfriend of Fernández, not his legal wife, they properly filed independent Customs declarations which correctly indicated that they were not carrying money in excess of the declarable minimum. We consider these claims, each in turn.

### III.

### *Miranda Violation*

█ No one doubts that, as a practical matter, routine questioning conducted by Customs officers does not require *Miranda* warnings. *United States v. Doe,* 878 F.2d 1546 (1st Cir.1989). Unfortunately, the courts have not developed a uniform approach to determine when, in the course of more involved Customs interrogation, an individual must receive *Miranda* warnings. The Supreme Court has remained conspicuously silent on the subject, and the several courts of appeals have pieced together approaches, no two of which are identical.

### A. *On–the–Scene Questioning*

Many courts have held that routine Customs questioning comes within the "on-the-scene questioning" exception found in *Miranda. Chavez–Martinez v. United States,* 407 F.2d 535 (9th Cir.1969); *United States v.*

---

**2.** "Mi mujer" is a Spanish-language colloquial expression meaning "my wife" or "my woman". The expression encompasses a wife by matrimony, common-law wife, or live-in girlfriend. Since 31 U.S.C. § 5316 (1988) and 31 C.F.R. § 103.23 (1944) have been interpreted to require a marital partnership to file a single declaration, Customs officers developed an interest in the whereabouts and Customs status of Cedeño when they learned that she had travelled in the company of Fernández that day.

**3.** Having already cleared Customs, Cedeño had previously filed an independent declaration by

which she stated that she was carrying less than $10,000.

**4.** Some weeks before the airport detention described here, Fernández had arrived at the San Juan International Airport with $40,000. Customs officers confiscated the money for failure to declare. After Fernández contested the forfeiture and prevailed, the money was returned to him. This incident put Customs on the lookout for Fernández and motivated close scrutiny of his comings and goings.

*Silva*, 715 F.2d 43 (2nd Cir.1983); *United States v. Henry*, 604 F.2d 908, 915 (5th Cir. 1979). *Miranda* created the "on-the-scene" exception with the following language:

> When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

*Miranda*, 384 U.S. at 477–78, 86 S.Ct. at 1629–30.

■ This language does effectively capture the notion that purely investigatory, non-custodial questioning need not be Mirandized where there exists none of the compelling atmosphere of in-custody interrogation. However, by its own language, the exception does not apply to questioning of an individual who is under "restraint".

■ Those courts that have applied the "on-the-scene" questioning exception to authorize un-Mirandized routine Customs interrogation necessarily imply that routine Customs interrogation is not "custodial" for purposes of *Miranda*. Anyone who has ever been in a Customs enclosure is keenly aware that they are not free to leave until they receive a Customs clearance, and that a Customs clearance will not be issued unless they cooperate in the fullest with Customs officials during both inspection and interrogation. It is, therefore, a masterwork of judicial disingenuity to suggest that an exception designed to cover on-the-scene questioning—where the subject is free to simply walk away—was ever intended to apply in an environment in which persons are deprived of their freedom until they have proven their entitlement to a Customs clearance.[5] Customs is an inherently coercive environment because an individual is never free to simply walk away; accordingly, we prefer an approach, detailed below, which stays within the bounds of *Miranda*.

## B. *Issues*

Given the jurisprudential disjunction regarding the application of *Miranda* to Customs interrogation, we focus here on the original purpose of the rule created in *Miranda v. Arizona*. *Miranda* aims to preemptively dispel the coercive atmosphere inherent in all custodial interrogation by informing or reminding the detainee of exercisable rights to silence and counsel. Notice that these rights are available is important because a detainee who exercises either of these rights effectively forecloses further questioning and precludes the coercive interrogation tactics with which the *Miranda* court was concerned.

■ In order to be effective, *Miranda* warnings must be provided to an individual subject to custodial interrogation at the instant that the underlying rights to silence and counsel attach. In essence, there are, then, four relevant inquiries in determining whether *Miranda* has been violated:

1. Was the person in "custody"? **and**
2. Was the person "interrogated"? **and**
3. Had the Fifth Amendment right against self-incrimination attached? **or**
4. Had the Sixth Amendment right to counsel attached?

We address these issues, each in turn.

## C. *Custody*

■ Some courts focus their analysis on the issue of custody, either independent of or in conjunction with an analysis under the on-the-scene exception to *Miranda*. Courts that focus on the issue of custody have held

5. Courts that have employed the on-the-scene exception to Customs inspections focus on the nature of the questioning to determine whether the questions asked exceed the scope of the claimed "on-the-scene" exception. While the nature of the questioning is relevant, this factor should be considered in determining when the questioning began to serve an accusatory, rather than purely investigatory, purpose. See discussion *infra*.

that, in the context of Customs interrogation, "custody for purposes of *Miranda*" depends not only on whether a reasonable person would have felt free to leave, but also upon whether there existed probable cause to make an arrest. *See United States v. Estrada–Lucas,* 651 F.2d 1261, 1266 (9th Cir.1980); *United States v. Moore,* 638 F.2d 1171 (9th Cir.1980). This approach confuses the issue of custody with the issue of when the defendant's rights to silence and counsel attach. In so doing, these cases create an unmanageable and unnecessary distinction between custody and "custody for purposes of *Miranda,*" for the degree of confinement does not necessarily depend at all upon the degree of actual or justified suspicion. The test for custody as enunciated by the Supreme Court depends exclusively upon whether a reasonable person in the defendant's position would have felt free to leave. *See Stansbury v. California,* — U.S. ——, —— – ——, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293 (1994). *See also Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); *Lowe v. United States,* 407 F.2d 1391, 1397 (9th Cir.1969).

As we have already noted, Customs is an inherently coercive environment. A traveler is not ordinarily free to leave Customs until granted a Customs clearance; the traveler who wishes to leave the compound may not simply walk away from an interrogating officer.[6] This is ordinarily a significant deprivation of freedom, sufficient to constitute "custody" within the meaning of the Fifth Amendment.[7]

### D. *Interrogation*

The parties do not dispute that all of the questioning conducted by Customs officers in this case constituted "interrogation" as defined and explained in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

### E. *Rights to Silence and Counsel*

While other courts have focused their analysis on the issue of custody or the scope of the on-the-scene exception to *Miranda,* we believe that the crux of the analysis in a case such as that now before the court properly focuses upon whether or not the defendant's rights to silence and counsel had attached by the time the inculpatory statements were made. Both the right to silence and the right to counsel attach when an individual becomes "accused" within the meaning of the U.S. Constitution. *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). We hold that in the context of Customs interrogation, these rights attach when the questioning has ceased to be purely investigatory and has become accusatory.

The test by which to determine whether interrogation has turned accusatorial has both an objective and a subjective element. The objective element, requires that officers provide *Miranda* warnings when there exists probable cause to make an arrest; at this point, the law presumes accusatorial intent. Courts agree that inculpatory, un-Mirandized statements made beyond this point in the course of custodial interrogation must be suppressed. *See, e.g., Estrada–Lucas,* 651 F.2d at 1265; *United States v. Layne,* 973 F.2d 1417, 1420 (8th Cir.1992); *United States v. Mejia,* 720 F.2d 1378, 1381 (5th Cir.1983).

The subjective element requires that officers provide *Miranda* warnings when it is apparent that the interrogating officer's purpose in questioning is not purely investigatory. The test enables the court to infer accusatory intent from the nature of the ques-

---

**6.** Even so, Cedeño was undoubtedly in "custody" and would not have felt free to leave when, while still in the Customs compound, she was directed by Inspector Fisher to secondary inspection.

**7.** Some courts have looked to the circumstances of the detention within Customs in order to determine whether the individual would reasonably have felt free to leave. *See, e.g., United States v.* *Pratt,* 645 F.2d 89, 90 (1st Cir.1981); *United States v. Henry,* 604 F.2d 908, 915 (5th Cir.1979); *United States v. Luther,* 521 F.2d 408, 410 (9th Cir.1975); *United States v. De La Cruz,* 420 F.2d 1093, 1096 (7th Cir.1970). While the circumstances of the detention may or may not confirm that a particular individual felt restrained, all reasonable people would agree that Customs is an inherently custodial setting, regardless of the circumstances of the interrogation.

tions asked, the basis for interrogation, and any other evidence that comes to the attention of the interrogating officer in the course of the interrogation.

A test for accusatory intent is more than mere judicial ornamentation of existing constitutional doctrine. The test brings within the scope of *Miranda* that type of police interrogation most at odds with the proscriptive intent of *Miranda:* Custodial interrogation initiated with only generalized suspicions which, nonetheless, evinces, at the outset or later in the course of the interrogation, an intent to extract a confession.

■ Routine questioning conducted by Customs officers during primary inspection is ordinarily purely investigatory.[8] Customs officials will ordinarily have no particularized suspicion of criminal conduct until initial, routine questioning indicates that more thorough inquiry is required. Questioning conducted at secondary inspection may also serve a purely investigatory purpose if the evidence secured creates no particularized suspicions. *United States v. Silva*, 715 F.2d 43, 46 (2nd Cir.1983).

But questioning that is not purely investigatory requires different treatment. In *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the Supreme Court held that the Sixth Amendment right to counsel will attach during interrogation, even if conducted before indictment, where the interrogation is "no longer a general inquiry into unsolved crime but has begun to focus on a particular suspect." *Id.* at 490, 84 S.Ct. at 1764. Our laws, reasoned the Court, must be coextensive with the rights which they are intended to protect. *Id.* at 488–89, 84 S.Ct. at 1764.

■ In translating *Escobedo* to the Customs context, we hold that an individual's right to silence and counsel attach when, in the course of a custodial interrogation, the nature of the questioning indicates that the interrogation no longer serves a purely investigatory purpose. In particular, when the questioning extends beyond that asked of the average Customs interrogee at either primary or secondary inspection, we infer that the interrogation has become sufficiently focused upon the interrogee to require *Miranda* warnings. This inference may be supported by the circumstances of the detainment, such as the length of the detainment, the basis for the original intervention and each additional stage of the interrogation, or the use of any coercive interrogation techniques. If it appears from the totality of circumstances that the interrogation had either begun or subsequently turned accusatory, and *Miranda* warnings were not then provided, we will disallow the testimonial evidence thereby procured. In short, we will not allow Customs officers to fly under the flag of interrogation where their actions betray an accusatory intent.

Though distinct in some aspects, our view of *Miranda* as it applies to Customs interrogations, shares the same considerations of fact as other approaches. *See, e.g., United States v. Henry*, 604 F.2d at 915 (warning required "only when the questioning by immigrations officials became an interrogation that was custodial in nature in which information was sought for the purpose of using it against defendant in a criminal proceeding."); *United States v. Konigsberg*, 336 F.2d 844, 850–51 (3rd Cir.1964); *United States v. New Jersey*, 351 F.2d 429, 436 (3rd Cir.1964).

■ Those courts that use the "on-the-scene" exception to *Miranda* employ a four-factored test to determine when there exists "custody for purposes of *Miranda*." *See, e.g., United States v. Henry*, 604 F.2d at 915; *United States v. Lueck*, 678 F.2d 895, 900 (11th Cir.1982); *United States v. Del Soccorro Castro*, 573 F.2d 213, 215 (5th Cir.1978). These factors consist of (1) whether there existed probable cause to make an arrest, (2)

---

8. *See United States v. Troise*, 796 F.2d 310, 314 (9th Cir.1986); *United States v. Hickman*, 523 F.2d 323 (9th Cir.1975). Though there exists no official listing of permissible routine questions, questioning regarding citizenship, length and purpose of stay, items purchased while abroad, and items to declare, normally fall within the ambit of the routine. *See United States v. Silva*, 715 F.2d 43, 47 (2nd Cir.1983). We note, however, that even common or routine questions require *Miranda* warnings when they are asked after interrogation has turned accusatory. *See* discussion, *infra.*

whether the officer subjectively intended to detain the defendant, (3) the subjective belief of the defendant about the ability to leave, and (4) the degree to which the investigation had focused upon the defendant. *Henry,* 604 F.2d at 915.

The first, second, and fourth of these considerations are either similar or identical to those compelled by our decision in this case. The third factor, while relevant, is, as we have explained, ordinarily a foregone conclusion in the context of a Customs investigation, where an individual rarely, if ever, would, objectively or subjectively, feel free to leave. The prime difference, in terms of the factual analysis required, is that our's are not just listed factors, one to be weighed against the presence or absence of the other. Instead, we require that each element (custody, un-Mirandized interrogation, and attached Fifth and Sixth Amendment rights) must exist simultaneously in order for a *Miranda* violation to have occurred.

### F. *Factual Analysis*

■■■ Having already concluded that both defendants were subjected to custodial interrogation, our approach next requires that we determine when the interrogation first turned accusatorial. We conclude that the interrogation turned accusatorial at the time Inspector Fisher asked Cedeño whether she was carrying any money.[9] Since the defendants were not Mirandized by the time this question was asked and answered, we suppress all statements made thereafter.

At the point Inspector Fisher asked Cedeño whether she was carrying any money, the investigation had clearly narrowed to a particular crime with particular defendants, based on what we infer to have been substantial, particularized suspicions. The entire intervention in this case was precipitated by residual suspicions from a prior intervention in which Customs officers were forced to return the money that they seized. Having been marked with suspicion and, perhaps, ill-will, Fernández was routed to secondary in-

spection before he even entered the line for routine primary inspection. At secondary inspection, officers had clearly begun to shape their accusatory theory when they began asking about the lingerie in Fernández' luggage. When officers discovered that the woman to whom the lingerie belonged was still in the building, they decided to test their accusatory theory by calling her to secondary inspection, after she had already cleared Customs and left the inspection area—again, at variance from the normal Customs routine.

Collectively, these facts leave us with little doubt that this was not the type of "routine investigation" for which courts have granted Customs officials certain limited exceptions, when conducting an investigation at the border, to our normal constitutional safeguards. Not only did the officers have a promising theory of guilt, their actions betray an accusatory intent such that they may well have had an incentive to extract a confession. Under these circumstances, the prophylactic rule of *Miranda* requires that the interrogee be informed of the rights to silence and counsel.

### IV.

### *Failure to Declare*

■■■ Section 5316 of the Title 31 of the United States Code states that,

(a) [a] person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly—(1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—(B) to a place in the United States from or through a place outside the United States;

Subsection (b) provides:

A report under this section shall be filed at the time and place the Secretary of the Treasury prescribes. The report shall contain the following information to the extent the Secretary prescribes:

---

9. Up to that moment, the initial questioning of Fernández was valid for a Customs setting. Questions about how much cash Fernández carried and whether he travelled alone or with a

family member were entirely legitimate. Cedeño's identification also passed muster, since the agents took Fernández' expression to mean that they were a married couple.

**370**

. . . .

(3) when the monetary instruments are not legally and beneficially owned by the person transporting the instruments, or if the person transporting the instruments personally is not going to use them, the identity of the person that gave the instruments to the person transporting them, the identity of the person who is to receive them, or both.

(4) the amount and kind of money instruments transported.

Section 103.23 of Title 31 of the Code of Federal Regulation states that,

[e]ach person who physically transports, mails, or ships, or causes to be physically transported, mailed, or shipped, or attempts to physically transport, mail, or ship, currency or other monetary instruments in an aggregate amount exceeding $10,000 at one time from the United States to any place outside the United States, or into the United States from any place outside the United States, shall make a report thereof. A person is deemed to have caused such transportation, mailing or shipping when he aids, abets, counsels, commands, procures, or requests it to be done by a financial institution or any other person.

Section 5324(b)(3) of Title 31 of the United States Code further provides that,

[n]o person shall, for the purpose of evading the reporting requirements of Section 5316, (3) Structure or assist in structuring, or attempt to structure, and importation or exportation of monetary instruments.

Under the plain import of these regulations, defendants will be found guilty of physically transporting the undeclared currency if they knew or should have known (1) that currency in excess of $10,000 was held between them, (2) that the currency belonged to a single person or entity, and (3) were aware of the reporting requirement and/or antistructuring law. As president of the business to which the money belonged, defendant Fernández may also be found liable, with the requisite showing of knowledge, for having caused the illegal, undeclared transportation of currency. It does not matter, for purposes of the antistructuring laws whether the money personally belonged to either of the defendants, or whether the defendants were married, so long as they each knew that they were transporting undeclared cash, collectively in excess of $10,000, that belonged to a single person or entity.

## V.

### *Conclusion*

All questioning after the Customs officers decided to test their accusatory theory on Cedeño should have been Mirandized. Accordingly, we suppress all statements made by the defendants after Inspector Fisher asked Cedeño whether she was carrying any money.

**IT IS SO ORDERED.**