**UNITED STATES of America, Plaintiff,**

v.

**Amado Fernandez VENTURA and Milagros Cedeño, Defendants.**

**Criminal No. 94–364 (JAF).**

United States District Court,
D. Puerto Rico.

Oct. 18, 1996.

Order Denying Reconsideration
Nov. 14, 1996.

---

Antonio R. Bazan, Asst. U.S. Attorney, Guillermo Gil, U.S. Attorney, San Juan, PR, for Plaintiff.

Linda Backiel, Gregorio Lima, Carlos Ramirez–Fiol, San Juan, PR, for Defendants.

## OPINION AND ORDER

FUSTE, District Judge.

In this case, in which the United States is prosecuting Amado Fernández Ventura and Milagros Cedeño for failing to declare the importation of over $10,000, this court previously ordered the suppression of inculpatory statements made in the absence of *Miranda* warnings. *United States v. Fernández–Ventura*, 892 F.Supp. 362 (1995). The First Circuit reversed this court's order, and remanded the case for a determination consistent with its opinion. *United States v. Ventura*, 85 F.3d 708 (1st Cir.1996). The rule has always been that Customs and border controls receive a broader leeway in their official duties regarding Fourth and Fifth Amendment concerns. With this in mind, we apply the principles set forth by the First Circuit in its opinion.

## I.

### Facts

Pursuant to the First Circuit's mandate, a fact-finding hearing was held on September 4, 1996. The government approved this court's findings of fact as published in *Fernández–Ventura*, 892 F.Supp. at 364. Accordingly, no additional findings of fact are required. A summary of the salient facts reported in our previous opinion follows.

Amado Fernández–Ventura traveled frequently between St. Maarten, N.A., and San Juan, Puerto Rico, and had $40,000 of his confiscated several weeks before the present case. Customs returned the money after Fernández–Ventura prevailed in his contest to the seizure. A computerized advisement had tipped off the officers to Mr. Fernández–Ventura's presence on November 12, 1994, the day of his arrest. After clearing Immigration controls at San Juan's Luis Muñoz Marín Airport, he was grabbed by Customs officers and immediately taken to the secondary inspection area. While guarded by four uniformed officers, two of which were armed, Mr. Fernández–Ventura was asked whether he had cash on his person. After he replied that he had $8,000, the officers then searched his suitcase, finding lingerie. Upon learning that the lingerie belonged to Mr. Fernández–Ventura's *mujer* (wife or girlfriend), the officers had Mr. Fernández direct them to her.

Milagros Cedeño had already cleared Immigration and Customs. Knowing this, she had neared the exit and was using a public telephone. The officers detained Cedeño and brought both defendants back to the same secondary inspection area where they had been questioning Mr. Fernández–Ventura. Upon questioning, Ms. Cedeño testified to having $9,000 in cash. The officers then searched the defendants and found them to be collectively in possession of $16,166, well above the $10,000 limit for each person or family unit requiring declaration according to 31 U.S.C. § 5316 (1988). The officers inquired as to the owner of the money and when Mr. Fernández–Ventura stated that the company of which he was president owned the money, the officers placed both defendants under arrest.

## II.

### Legal Standards

Before the custodial interrogation of a suspect, *Miranda* warnings are required. Two kinds of situations constitute custody: "[A] formal arrest or restraint on freedom of movement associated with a formal arrest," *Thompson v. Keohane*, —— U.S. ——, ——, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995) (quotation marks and citations omitted). The latter requires an analysis of whether a reasonable person in the suspect's shoes would have understood the situation to involve a restraint on freedom of movement associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, ——, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). There

are several common markers of a custodial situation, some of which were outlined in this case's previous appellate decision by the First Circuit. *Ventura,* 85 F.3d at 711. Other circumstances were laid out in *Sprosty v. Buchler,* 79 F.3d 635, 641 (7th Cir.1996), cited by the First Circuit. *Ventura,* 85 F.3d at 711. As the First Circuit noted, the test for custody is a fact-intensive examination. *Id.* Having reviewed the factors used by different courts, we have extrapolated three that address the principal concerns in this area of the law.

■ First, we must determine "whether the suspect was questioned in familiar, or at least neutral surroundings," *United States v. Streifel,* 781 F.2d 953, 961 n. 13 (1st Cir. 1986), and the degree of police control over the environment in which the interrogation took place. *United States v. Griffin,* 7 F.3d 1512, 1518 (10th Cir.1993); *Sprosty,* 79 F.3d at 641. The number of law enforcement officers may clarify this first factor. *See Streifel,* 781 F.2d at 961 n. 13.

The second factor relevant to the custody determination is the degree of physical restraint placed on the suspect, and whether the suspect was advised or could have reasonably believed that he or she could interrupt prolonged questioning by leaving the scene. *Streifel,* 781 F.2d at 961; *Griffin,* 7 F.3d at 1518; *Sprosty,* 79 F.3d at 641; *United States v. Johnson,* 64 F.3d 1120, 1126 (8th Cir.1995). A third factor is the duration and character of the interrogation and, in particular, whether there has been prolonged, coercive and accusatory questioning or whether the police have employed subterfuge in order to induce self-incrimination. *Streifel,* 781 F.2d at 961 n. 13; *Sprosty,* 79 F.3d at 641; *Johnson,* 64 F.3d at 1126.

■ Interrogation is the second part of the test to determine whether, because of custodial interrogation, rights to counsel and silence have attached. Fortunately, interrogation is more easily spotted than custody. If an officer should know that a question is reasonably likely to elicit an incriminating response, and a reasonable person would perceive the question as an interrogative one, there is an interrogation. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980); *United States v. Taylor,* 985 F.2d 3, 7 (1st Cir.1993).

■ The Customs context in which the defendants were arrested raises the degree of scrutiny the above standards require. The policy objective of controlling the borders of the United States necessitates the questioning of citizens and noncitizens by Customs officials. Universally-applied elements of Customs procedures cannot be considered *per se* custodial, including the "secondary questioning" in which travelers of heightened suspicion are taken in for a further questioning. See *Ventura,* 85 F.3d at 711; *United States v. Pratt,* 645 F.2d 89, 90 (1st Cir.1981). In short, for the rights of counsel and silence to attach in a Customs setting, the experience must be perceptibly outside the routine Customs process.

■ Yet, these policy objectives do not obviate the constitutional requirements regarding custodial interrogation. Rather, these objectives require that the failure to Mirandize suspects be accompanied by especially egregious circumstances to comprise a constitutional violation meriting the suppression of evidence. We find that the facts of the present case demonstrate such an unacceptable violation.

## III.

### *Analysis*

The inquiry required is whether the defendants were subjected to a custodial interrogation that caused their rights to counsel and silence to attach. Turning to the first element, we find that a reasonable person in the suspects' shoes would have understood the situation to be a custodial one.

■ The first indicator of a custodial situation is whether the surroundings are familiar or neutral, *Streifel,* 781 F.2d at 961 n. 13, and the degree of police control over the environment in which the interrogation took place. *Griffin,* 7 F.3d at 1518; *Sprosty,* 79 F.3d at 641. Customs situations are not generally considered to be neutral, since the Customs officials have extensive powers to search and question travelers. But since

Customs situations are not *per se* custodial, it stands to reason that this lack of neutrality is generally acceptable. *Ventura*, 85 F.3d at 712. However, in this case, the Customs officials created an atmosphere that easily surpassed the routine Customs situation. First, Customs officers did not conduct a general primary inspection; Mr. Fernández–Ventura was taken immediately to secondary questioning after leaving the Immigration control area. This action created an atmosphere of custody beyond routine Customs investigations, which begin in the primary questioning area. Although the intent of the officers is not a valid consideration in determining how a reasonable person in this situation would have felt, *Stansbury*, 511 U.S. at ——, 114 S.Ct. at 1529, the officers' behavior would have communicated the serious nature of the investigation to any reasonable person in the suspects' shoes. The number of officers present further elaborates on the degree to which the situation occurred in a police-controlled environment. The fact that there were four uniformed officers with the defendants at all times, two of whom were armed, indicates the degree to which the situation was out of the ordinary and, therefore, a custodial one.

The second indicator is whether there was physical restraint placed on the suspect, and whether the suspect was advised or could have reasonably believed that he or she could interrupt prolonged questioning by leaving the scene. *Streifel*, 781 F.2d at 961 n. 13; *Griffin*, 7 F.3d at 1518; *Sprosty*, 79 F.3d at 641; *Johnson*, 64 F.3d at 1126. Although neither Mr. Fernández–Ventura nor Ms. Cedeño were physically restrained, they were unaware of any ability to leave and were in fact unable to leave. Any reasonable person in this situation would experience a heightened sense of being in custody. In addition, although the pat-down of Mr. Fernández–Ventura by itself is not proof of a custodial situation, it too points toward an increased sense of official control. It is also significant that Mr. Fernández–Ventura was taken immediately to the secondary inspection area, without the usual primary questioning. For any reasonable person familiar with Customs procedures, immediate increased scrutiny

would convey to the passenger the extent to which he is not free to leave.

Most significantly, Customs officers brought Ms. Cedeño back for further questioning after she had cleared Customs and had been released. The act of returning to custody someone who had been released from routine Customs questioning would cause any reasonable person to feel her freedom of movement restrained to a degree associated with formal arrest. The United States illogically argues that this situation was merely a secondary questioning, often considered noncustodial according to the First Circuit's holding in *Pratt*, 645 F.2d at 90. Ms. Cedeño's presence in the formal Customs area might seem to make her available for further Customs questioning, but there is no doubt that a person who has cleared Customs would reasonably understand the routine Customs process to have been complete, even before exiting. Subsequently, any reasonable person would interpret the extraordinary act of being returned to Customs as undeniably custodial. Ms. Cedeño's return accompanied an increasingly pointed questioning that marked the transition to a custodial situation.

The third indicator is the duration and character of the questioning and, in particular, whether there has been prolonged, coercive, and accusatory questioning or whether the police have employed subterfuge in order to induce self-incrimination. *Streifel*, 781 F.2d at 961 n. 13; *Sprosty*, 79 F.3d at 641; *Johnson*, 64 F.3d at 1126. The questioning in the instant case was indeed prolonged. In the *Pratt* case, 645 F.2d 89, the First Circuit held that the interview was, at fifteen minutes, too short to be anything but a routine customs investigation. The court cited a string of cases regarding the length of time that may lead to a conclusion of custody. In one of the cases cited, *United States v. Garcia*, 496 F.2d 670 (5th Cir.1974), a detention of at least an hour was held to be custodial. In the present case, the defendants were interrogated for approximately one hour and twenty minutes before they were formally arrested. Focused questioning for nearly an hour and a half is not routine nor is it a mere inconvenience; even the most patient travel-

er would be convinced of his or her custody after such time had elapsed. Although the police employed no subterfuge, their questions reflected the accusatory nature of the interrogation. The character of the questioning turned quite specific and interrogative once Ms. Cedeño was brought back for further questioning: Both defendants were treated in an accusatory manner that reflected the suspicions on the part of the officers.

■ The second prong of the test to determine whether the rights to counsel and silence had attached is whether the questioning constituted interrogation. *Ventura*, 85 F.3d at 711. In the present case, the questioning clearly constituted interrogation because the officers used questions pointed toward the crime they suspected was afoot: A violation of 31 U.S.C. 5316 (1988). Indeed, the First Circuit, in its review of this case, concluded that the questions posed to the defendants clearly constituted interrogation. Thus, the above examination reveals the extent to which this situation was a custodial interrogation.

### IV.

#### *Conclusion*

Customs officials should have read both defendants their rights in accordance with *Miranda* before commencing the questioning of Ms. Cedeño. Accordingly, all statements made by the defendants after the first question to Ms. Cedeño upon her retrieval are suppressed.

**IT IS SO ORDERED.**

#### *OPINION AND ORDER ON RECONSIDERATION*

On June 30, 1995, this court granted defendants' motion to suppress statements made during a Customs investigation that took place at San Juan's Luis Muñoz Marín International Airport. The government appealed the decision to the First Circuit, which vacated the order and remanded the case. *United States v. Ventura*, 85 F.3d 708 (1st Cir.1996). On October 18, 1996, this court filed the Opinion and Order in this case, following the Circuit's enunciation of the law, but again

granting defendants' motion to suppress. *See United States v. Ventura*, 947 F.Supp. 25 (D.P.R.1996). On October 29, 1996, the government moved for reconsideration of that Opinion and Order. *See Docket Document No. 61.*

The government raises several discrete challenges to our explication of the facts and obedience to the law illuminated by the First Circuit. We first weigh the general challenges, then address those specific to our analysis.

### I.

The government asserts that we erred in again suppressing the evidence, contending that "[i]t should follow that the applicable standard and conclusion should then be that suggested by the Court of Appeals for the First Circuit in this same case." *Docket Document No. 61, at 5.* The thrust of the First Circuit's mandate was to apply "the correct legal test," 85 F.3d at 712, and the decision accordingly contains not even the subtlest of hints on the determination of facts regarding the custody issue. That the Circuit found the standard for interrogation had been met only highlights the absence of any factual ruling on custody. *Ventura* unambiguously determined the law of custody in the Customs context and the facts regarding interrogation. The principal responsibility of this court was to make a determination of whether the defendants were in custody pursuant to this enunciation of the law.

The government further criticizes this court's decision as a *per se* custody analysis. Although our previous decision was justly corrected for analyzing Customs situations generally rather than contextually, we subsequently posited that, far from being *per se* custodial, Customs investigations merit a high threshold for the attachment of the rights to counsel and silence. The government, however, implies that the reversal of our previous decision automatically renders its converse verisimilar; that Customs situations can never be custodial. However high the threshold for the requirement of mirandizing in a Customs context, it cannot be so

high as to render *Miranda* inapplicable to questioning conducted by Customs officials.

Viewing the Circuit's enunciation of the law as a directive to deny the motion to suppress, the government disparages the standard employed by this court. The Circuit irrefutably positioned the test for a custodial situation as whether a reasonable person in the defendant's shoes would feel restrained in a manner similar to a formal arrest. The Circuit pointed to a somewhat open set of circumstances that aid in the application of this test: "[T]here may be tests which, though formulated differently, approximate the proper standard ..." 85 F.3d at 712. In laying out some of the circumstances, the Circuit stated: "[R]elevant circumstances include," 85 F.3d at 711, indicating the extent to which various formulations may accurately assess how a reasonable person would perceive a potentially custodial situation. Other examples of legitimate circumstances appear in *Sprosty v. Buchler*, 79 F.3d 635 (7th Cir.1996), cited approvingly by the First Circuit in *Ventura*, 85 F.3d at 711 n. 3.

Given the multiplicity of circumstances by which to judge a potentially custodial situation, we examined the various formulations proffered by different circuit courts, including the First Circuit's *Ventura* and *United States v. Pratt*, 645 F.2d 89 (1st Cir.1981) cases. The circumstances employed in all the cases we examined emerged into three themes: The atmosphere of the questioning, the physical and psychological confinement of the person being questioned, and the length and nature of the questioning. Although many were not in the Customs context, this environment does not alter the test—it merely elevates the satisfaction of that test because of the sanctioned and routine police control. We appropriately employed this discrete, simple standard that reflects the breadth of the law. To respect the deference accorded to Customs, we ignored universally-applied aspects of Customs investigations.

## II.

■ Rather than retell our recent opinion, the following analysis will center on responding to the government's criticisms.

The first indicator of a custodial situation is whether the environment is familiar or neutral and the degree of police control of the environment in which the interrogation took place. *United States v. Streifel*, 781 F.2d 953, 961 n. 13 (1st Cir.1986); *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir.1993); *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir.1996). Although the routine controls imposed on citizens by Customs may not be considered, the apparently irregular practice of immediately taking Mr. Fernández–Ventura into secondary questioning helped create an environment that went beyond the routine to the custodial. The government asserts that Mr. Fernández–Ventura was "directed" to the secondary table, rather than "grabbed". *Docket Document No. 61, at 2.* Verb choice notwithstanding, the government concedes Mr. Fernández–Ventura was singled out based on a computerized report, spotted, and forwarded to an advanced level of investigation, regardless of his will.

The government challenges the court's explanation of the police control of the defendants. As the government stated, and as we implied in our decision, guns were not drawn during the interrogation. However, Mr. Fernández–Ventura and Ms. Cedeño were guarded by four officers during the course of this incident. Mr. Fernández–Ventura was led to Officers Fischer and Rausch by Officer Espada, who was armed. After some interrogation, Officer Alvino, who was armed, joined Officers Rausch and Fischer to conduct further interrogation. *Docket Document No. 49, at 54–55.* Finally, the government, counter factually convinced that we disagreed, points out that "[t]he lack of familiarity with the surroundings on the part of the defendants is not dispositive." Not only is it not dispositive, it is not very relevant in the Customs situation, because that lack of familiarity is the most universal element of Customs. Exactly for this reason, we concentrated on the treatment of the defendant and the extent of police control which led us to find that such control was significantly above the customary level in Customs.

■ The second indicator of a custodial situation is whether there was physical restraint placed on the suspects, and whether

the suspects could have reasonably believed that they could interrupt prolonged questioning by leaving the scene. *Streifel*, 781 F.2d at 961; *Sprosty*, 79 F.3d at 641; *Griffin*, 7 F.3d at 1518; *United States v. Johnson*, 64 F.3d 1120, 1126 (8th Cir.1995). Our analysis here focused on the return of Ms. Cedeño to the Customs interrogation area. A reasonable person who had cleared Customs and was then called back for further questioning would surely feel restrained.

The government raised a challenge here, signaling this court to the case of *United States v. Wardlaw*, at 576 F.2d 932 (1st Cir.1978). In that 1978 case, one of the defendants argued for suppression of the cocaine seized from her as the fruit of an unlawful search initiated after she had been sitting in front of the Luis Muñoz Marín International Airport. The First Circuit correctly held that a bodily search after Customs clearance was a justified border search in an international border airport.

This holding does not affect our decision. The law of custodial interrogation is patently distinct from the law of search and seizure. The latter involves the objective test of whether a warrantless search was reasonable, *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), whereas in this case we must inquire whether a reasonable person *in the suspect's shoes* would feel restrained to a degree associated with arrest. Here, we suppressed statements that resulted from interrogation, not items seized as a result of a search. Though *Wardlaw* serves as a useful precedent in a search context, the automatic transposition of its rule to the interrogation context ignores the nature of the reasonable person analysis required. Consonant are not lawful seizure and custodial interrogation.

Ms. Cedeño's indubitable presence in the formal Customs area would lead one to think her available for questioning.[1] However, Ms. Cedeño faced interrogation after having been cleared, before which Customs officials supposedly followed the routine procedure for acquiring relevant information and screening for criminal activity. After clearance, Ms. Cedeño had walked from seventy to one-hundred feet and had passed through glass doors to a separate area, where she was utilizing a public telephone. *Docket Document No. 49, at 68*. Only afterward was Ms. Cedeño further questioned.

The subjection to a second round of questioning after having already received approval to leave Customs is the exact element that would make any reasonable person in Ms. Cedeño's shoes feel confined. Were this situation an "extended border search," *Docket Document No. 61, at 9*, it would not magically liberate Customs officials from respecting *Miranda*.

The court's characterization of the return of Ms. Cedeño for further questioning does not warrant the government's opprobrium. Instead of being detained, they argue that Ms. Cedeño was "asked to come back into the Customs enclosure to answer questions pertaining to the reporting requirements that all passengers arriving from a foreign country must comply with." *Docket Document No. 61, at 5*. This rosy twist would indeed, in the words of the government, "change[ ] the whole panorama and facts of this case." *Id.* Ms. Cedeño could not refuse this request, and was, in a word, detained. The verb seems even more appropriate if we note that the government, later in its motion for reconsideration, describes the incident thus: "[The officers] decided to find her and bring her back." *Id.* at 9. Even if one were to accept Ms. Cedeño's return as the result of a request, a reasonable person would still interpret such a request from Customs officials as a situation from which she was not free to leave.

The third indicator is the duration and character of the questioning, and whether there had been prolonged, coercive, and accusatory questioning or whether the police employed subterfuge in order to induce self-incrimination. *Streifel*, 781 F.2d at 961 n. 13; *Sprosty*, 79 F.3d at 641; *Johnson*, 64 F.3d at 1126. Although the government asserts that the time span of the interrogation was "rath-

---

1. Whether Ms. Cedeño was inside or outside the jurisdiction of Customs is not the preeminent fact in this determination, because in either case a person who had received clearance would reasonably feel restrained by further Customs interrogation.

er short," *Docket Document No. 61, at 7*, the time was indeed unreasonably long. Mr. Rausch testified that the pat-down search of Mr. Fernández–Ventura took place around 8:10 or 8:15 P.M., *Docket Document No. 49, at 116*, and the waiver was signed at 9:40 or 9:45. *Id.* at 78. This time span, as we stated in our Opinion, far exceeds the length of time a reasonable person would endure without feeling restrained.

 Finally, the government, in an admittedly superfluous move, questions the court's fact-finding regarding the word used by Mr. Fernández–Ventura to describe Ms. Cedeño. Mr. Fernández–Ventura claimed that he used the word "mujer", whereas Officer Fischer claimed the word was "esposa". *Docket Document No. 49, at 140.* The latter word specifically means "wife", whereas the former may mean "wife" or "girlfriend". Because 31 U.S.C. § 5316 (1988) imposes a $10,000 limit on imports of non-reported cash *per family*, had Mr. Fernández–Ventura said "esposa", it would have deepened the suspicions of the officers. The court accepted the defendant's recall rather than Officer Fischer's because Mr. Fernández–Ventura's reported use of "esposa" would be patently illogical, given that he is not actually married to Ms. Cedeño, and would probably know the word would implicate himself as well as Ms. Cedeño. Inconsequential is this fact, since it would merely have affected the officer's intentions, which may not be considered in the analysis of a potentially custodial situation. *Stansbury v. California*, 511 U.S. 318, —— ——, 114 S.Ct. 1526, 1529–30, 128 L.Ed.2d 293 (1994).

### III.

We have reviewed the bases for the government's challenge to our Opinion and Order and find them unconvincing. The government would like this court to ignore *Miranda* in its analysis of Customs situations and, although such situations merit an obeisant review, some Customs questioning reach a level at which the rights to counsel and silence attach. That point was surpassed at Ms. Cedeño's return for interrogation and we, accordingly, suppress their statements from that time until the signing of the waiver of rights.

**IT IS SO ORDERED.**