132 F.3d 844
 UNITED STATES, Appellant,
v.
Amado FERNANDEZ-VENTURA and Milagros A. Cedeno, Defendants--Appellees.
 No. 97-1254.
 United States Court of Appeals,
First Circuit.
 Heard Aug. 1, 1997.
Decided Jan. 6, 1998.
 
 Demetra Lambros, Attorney, Department of Justice, Washington, DC, with whom Guillermo Gil, United States Attorney, Washington, DC, Antonio R. Bazan, Assistant United States Attorney, Hato Rey, PR, and Nina Goodman, Attorney, Department of Justice, Washington, DC, were on brief for appellant.
 Linda Backiel, with whom Gregorio Lima, Bayamon, PR, and Carlos Ramrez-Fiol, San Juan, PR, were on brief for appellees.
 Before LYNCH, Circuit Judge, HILL* and JOHN R. GIBSON,** Senior Circuit Judges.
 JOHN R. GIBSON, Senior Circuit Judge.
 
 
 1
 Once again the appeal of the United States in the case of Amado Fernandez-Ventura and Milagros Cedeno is before us. Fernandez-Ventura and Cedeno were indicted for failing to declare currency in excess of $10,000 brought into the United States, 31 U.S.C. §§ 5316 and 5322 (1994), and for making false statements in a matter within the jurisdiction of the United States Customs Service, 18 U.S.C. § 1001 (1994). Their motions to suppress statements they had made to the Customs officers at San Juan's international airport were granted on the ground that they had been subjected to custodial interrogation without the benefit of Miranda[1] warnings. We reversed the district court, United States v. Ventura, 85 F.3d 708 (1st Cir.1996) (Ventura I ), and remanded for reconsideration under the proper legal standard. The district court reexamined the record in light of our opinion and again suppressed the evidence for failure to comply with Miranda. The United States appeals, and we again reverse.
 
 
 2
 Fernandez-Ventura flew from St. Maarten, Netherlands Antilles, to San Juan, Puerto Rico on November 12, 1994. The Customs Service had Fernandez-Ventura's name on a computerized "lookout" list, due to his frequent travel between the two cities. After Fernandez-Ventura cleared immigration, Customs inspector Rose Espada sent him to the secondary Customs inspection area, where Customs officers Eugene Fischer and Richard Rausch interviewed him and searched his bags. Officer Fischer asked Fernandez-Ventura whether he was bringing more than $10,000 cash into the United States, and Fernandez-Ventura said, "No." He said he had about $8,000.
 
 
 3
 Meanwhile, Officer Rausch found women's clothing in Fernandez-Ventura's bag and asked him why he had it. Fernandez-Ventura replied that the clothing belonged to his "mujer" ("wife" or "woman"), who was traveling with him. The inspectors asked Fernandez-Ventura where she was, and he took Fischer to find her. Milagros Cedeno, Fernandez-Ventura's girlfriend, had already cleared the check point and was waiting inside the Customs enclosure. Fernandez-Ventura beckoned to Cedeno, and she returned with Fischer and Fernandez-Ventura to the inspection area. As they walked, Fischer asked Cedeno if she had more than $10,000 in cash, and she replied that she had about $9,000. Rausch searched Cedeno's purse and found $9,500.
 
 
 4
 Rausch then contacted a supervisor, Hector Alvino, to ask for permission to search Fernandez-Ventura. Rausch found $6,666 in cash on Fernandez-Ventura. Alvino then became involved in the questioning. Alvino asked Fernandez-Ventura who owned the $6,666, and Fernandez-Ventura replied that the money belonged to his money exchange company. Alvino then asked who owned the $9,500 in Cedeno's possession, and Fernandez-Ventura said that money also belonged to the company. Fernandez-Ventura said that he was president of the company.[2] Alvino then sent for a special agent to arrest Fernandez-Ventura. The agent told Fischer to read Fernandez-Ventura and Cedeno their rights. They signed Miranda waiver cards.
 
 
 5
 The district court initially suppressed the statements made after Fischer asked Cedeno if she was carrying any money. United States v. Fernandez Ventura, 892 F.Supp. 362, 369 (D.Puerto Rico 1995). The district court held that, since Fernandez-Ventura and Cedeno were not free to leave the interview, they were therefore in custody and entitled to Miranda warnings. The court wrote, "Customs is an inherently coercive environment." Id. at 367. The district court also relied on the officers' state of mind and their belief that they had a "promising theory of guilt." Id. at 369.
 
 
 6
 We reversed, holding that the district court erred in concluding that Fernandez-Ventura and Cedeno were in custody because they could not leave. We held:
 
 
 7
 Individuals subject to routine traffic stops or customs inspections, circumstances which are not custodial, are rarely free to leave while being questioned by an officer. The relevant inquiry, however, ... is whether there was an arrest or restraint on freedom of movement of the degree associated with a formal arrest.
 
 
 8
 Ventura I, 85 F.3d at 712. We further stated that the district court erred in considering the officers' focus on Fernandez-Ventura and Cedeno, which was not relevant to a Miranda inquiry.
 
 
 9
 On remand, the district court reexamined the custody issue, looking at three factors: (1) the nature of the surroundings and the extent of police control over the surroundings; (2) the degree of physical restraint placed on the suspect; and (3) the duration and character of the questioning. United States v. Ventura, 947 F.Supp. 25, 29 (D.Puerto Rico 1996). The district court held that the surroundings were indicative of custody because the officers sent Fernandez-Ventura straight to secondary inspection without first going through primary inspection, and because there were "four uniformed officers with the defendants at all times, two of whom were armed." Id. at 30. The court conceded that neither Fernandez-Ventura nor Cedeno was physically restrained, but held that the second factor nevertheless weighed in favor of custody because "they were unaware of any ability to leave and were in fact unable to leave." Id. Moreover, the court considered it very important that Cedeno had already cleared Customs when the officers asked her to return. Id. Finally, the court held the duration of the questioning, approximately one hour and twenty minutes, was indicative of custody. Id. The court again suppressed the statements made after Cedeno was returned to the inspection area. Id. at 31.
 
 
 10
 The district court's conclusion that a person is in custody is a mixed question of fact and law, subject to de novo review. Thompson v. Keohane, 516 U.S. 99, 100-02, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995). The district court's findings of historical fact concerning the circumstances of the interrogation are reviewed for clear error. See Ornelas v. United States, 517 U.S. 690, ----, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). The ultimate question is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Thompson, at 112, 116 S.Ct. at 465 (internal quotation omitted). The test is not applied mechanically, but in view of the totality of the circumstances. See id. at 113-15, 116 S.Ct. at 466. We conclude that the district court once again applied this test erroneously.
 
 
 11
 The most significant circumstance is that this incident occurred in the course of a Customs inspection at our nation's border. In the context of Customs inspections, our assessment of whether an interrogation is custodial must take into account the strong governmental interest in controlling our borders. See United States v. Moya, 74 F.3d 1117, 1119 (11th Cir.1996). "[Q]uestions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry points. This understanding cuts against the potentially coercive aspect of the Customs inquiry, and lessens the need for Miranda warnings." Ventura I, 85 F.3d at 711 (citations omitted). The Eleventh Circuit has stated, "[E]vents which might be enough to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into he country." Moya, 74 F.3d at 1120.
 
 
 12
 In its conclusion that the surroundings suggested the defendants were in custody, the district court placed great reliance on the fact that the officers skipped primary inspection and took Fernandez-Ventura directly to secondary inspection. We said in Ventura I that "even secondary inspection does not per se constitute custodial interrogation." 85 F.3d at 711. Accord United States v. Pratt, 645 F.2d 89, 90 (1st Cir.), cert. denied, 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981); Moya, 74 F.3d at 1120. Since secondary inspection is not innately custodial, we fail to see how going directly to secondary inspection makes the questioning more coercive. As a practical matter, this likely reduces the total time the traveler has to spend in Customs, which makes the questioning less coercive, not more.
 
 
 13
 The district court's opinion on remand stated that the surroundings were coercive because "there were four uniformed officers with the defendants at all times." 947 F.Supp. at 30. The government pointed out that the officers were not all present simultaneously. Espada delivered Fernandez-Ventura to Fischer and Rausch, and then left. Fischer went with Fernandez-Ventura to get Cedeno, and as the three of them walked, Fischer asked Cedeno what cash she was carrying. After Fischer found the $9,500 on Cedeno, Alvino appeared on the scene. The district court changed its opinion on reconsideration to say that Fernandez-Ventura and Cedeno were "guarded by four officers during the course of this incident," 947 F.Supp. at 32 (emphasis added), but the court did not change its conclusion that there were too many officers. We conclude that the early involvement of Espada was inconsequential. The presence of the three others is not so unusual as to convert a Customs inspection into an arrest. See United States v. Tajeddini, 996 F.2d 1278, 1281, 1288 (1st Cir.1993) (three Customs officers present; no custody); United States v. Park, 947 F.2d 130, 132-33, 138 (1991) (same), vacated in part on other grounds, 951 F.2d 634 (5th Cir.1992).
 
 
 14
 The district court also emphasized the fact that Alvino and Espada were armed. The court conceded on reconsideration that "guns were not drawn" during the incident. 947 F.Supp. at 32. The testimony at the hearing was that Espada and Alvino were required to be armed as part of their jobs. The presence of armed officers in this case was simply a part of the Customs routine and not an extraordinary circumstance.
 
 
 15
 Though the district court conceded that Fernandez-Ventura and Cedeno were not subjected to physical restraint, it resolved the physical restraint factor against the government for three reasons: (1) the two were "in fact unable to leave," id. at 30; (2) Fernandez-Ventura was subjected to a pat-down search, id.; and (3) Fischer requested that Cedeno return to Customs after she had already passed through, id. None of these facts bears the weight the district court placed on them. First, in Ventura I we specifically instructed the district court that it could not infer that travelers were in custody because they were not free simply to walk away from Customs inspectors. 85 F.3d at 712. Yet, the district court exhibited the same reasoning on remand despite our explicit disapproval. Next, a pat-down search in a Customs inspection was insufficient to tip the scales against the government in Pratt, 645 F.2d at 91, and there is nothing unusual about the search in this case to give it greater importance here. Even though Cedeno had passed through the inspection station, she had not left the international border area, with its attendant obligations to cooperate in the Customs process. Moreover, her traveling companion was still in inspection and she was apparently waiting for him. Therefore, her progress past the inspection area did not remove her from the Customs context. Cf. United States v. Wardlaw, 576 F.2d 932, 935 (1st Cir.1978)(applying relaxed standard for search at international border where defendant not only cleared Customs, but also left the airport building before being called back to Customs).
 
 
 16
 Finally, the district court found that the interrogation lasted one hour and twenty minutes. The district court held, "This time span ... far exceeds the length of time a reasonable person would endure without feeling restrained." 947 F.Supp. at 34.
 
 
 17
 Even the finding of historical fact that the questioning took an hour and twenty minutes is problematic. The district court found that the interrogation began at 8:10 or 8:15, based on Rausch's testimony about the time of the pat-down of Fernandez-Ventura. The court found the interrogation ended at 9:40 or 9:45, based on the times stated in the Miranda waiver forms. Id. However, these do not appear to be the relevant times, since the pat-down search occurred near the end of the questioning. On the Miranda forms Fernandez-Ventura and Cedeno indicated that they were not detained until 9:10. The record certainly does not indicate that there was protracted questioning after the pat-down search. Rather, the witnesses recounted a few straightforward questions, followed by a call for a special agent to come and arrest Fernandez-Ventura and Cedeno. Therefore, although the record may support the conclusion that one hour and twenty minutes (or more) elapsed during the defendants' encounter with Customs, it does not support the district court's inference that they were therefore subjected to "focused questioning for nearly an hour and a half." 947 F.Supp. at 30.
 
 
 18
 Additionally, the district court held that the custody began when Fischer began to question Cedeno. Id. at 31. This occurred before the pat-down search, which the district court used as the beginning of the one-hour-twenty-minute period. We reject the circular reasoning using the lapse of time as a factor in determining that the two were in custody at a point before the one-hour-twenty-minute time period even began.
 
 
 19
 Moreover, even if the questioning did take one hour and twenty minutes, we have already concluded that the other circumstances of the questioning were routine. The duration of the encounter is "never a singly determinative factor," Pratt, 645 F.2d at 91, and the duration in this case was not extraordinary. We are not prepared to say Customs inspections cannot take this long without becoming an arrest, or even that a delay of this length is strongly indicative of arrest. See Park, 947 F.2d at 133, 138 (no arrest where Customs inspection lasted three to four hours).
 
 
 20
 We conclude that the factors cited by the district court do not distinguish this case from a routine Customs inspection so as to support the court's conclusion that Fernandez-Ventura and Cedeno were in custody. We remand for further proceedings in accordance with this opinion.
 
 
 
 *
 Of the Eleventh Circuit, sitting by designation
 
 
 **
 Of the Eighth Circuit, sitting by designation
 
 
 [1]
 Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)
 
 
 [2]
 Though Fernandez-Ventura and Cedeno each had less than $10,000, the government contends that all the money belonged to one owner and is therefore aggregated. United States v. Fernandez Ventura, 892 F.Supp. 362, 370 (D.Puerto Rico 1995)