UNITED STATES of America,
Plaintiff,

v.

Diana LANTIGUA LORENZO,
Defendant.

No. CR:10–417 (DRD).

United States District Court,
D. Puerto Rico.

July 21, 2011.

Elba I. Gorbea–Padro, United States Attorneys Office, District of Puerto Rico, San Juan, PR, for Plaintiff.

Hector E. Guzman–Silva, Federal Public Defender's Office, Hato Rey, PR, Mauri De Waun Gray, Office of the Federal Public Defender, Jose C. Romo–Matienzo, San Juan, PR, for Defendant.

## OPINION AND ORDER

DANIEL R. DOMÍNGUEZ, District Judge.

### I. BACKGROUND

Pending before the Court is a request for the suppression of certain statements made by codefendant, Diana Lantigua Lorenzo ("Diana Lantigua")(Docket No. 98). Diana Lantigua, and her brother Breidy Lantigua, took a one-week cruise aboard the Royal Caribbean Cruise Lines vessel, the *Serenade of the Seas,* from October 17th to October 24th, 2010. The statements in questions were made when she was referred to secondary Customs and Immigration inspection after disembarking in San Juan, Puerto Rico on October 24, 2010. The inspection took place at the Pan American dock, specifically in the San Juan Bay Marina dock, a facility located east of the José V. Toledo U.S. Post Office and Courthouse in Old San Juan, Puerto Rico.

The facts that are considered by the Court as to the suppression of statements are based exclusively on the facts known by the Customs and Border Patrol ("CBP") officers at the time of the initial and secondary inspection. Gloria Alvarez, a CBP inspector officer, received a referral from another CBP officer, Denise Cruz. Denise Cruz testified that she referred the sister and brother duo for secondary inspection because two young siblings taking a family vacation together is not a common practice. Further, both siblings appeared to have a nervous demeanor.[1]

Diana and Breidy Lantigua were thus sent to secondary inspection where Officer Alvarez continued the investigation. Diana Lantigua initially told Officer Alvarez that she cleaned offices six days a week.[2] CBP Officer Josefina Collazo aided Officer Alvarez with Diana Lantigua's secondary inspection.

Officer Alvarez assigned male passenger Breidy Lantigua to male CBP Officer Joel Rivera. Breidy told Officer Rivera that he was a student, and later told another inspector that he was washed cars. Diana and Breidy Lantigua each had two pieces of luggage and Diana Lantigua also had a purse.

### II. FACTUAL HISTORY AT THE SECONDARY INSPECTION

The Court proceeds to narrate the relevant facts from Diana Lantigua's secondary inspection. Diana Lantigua drafted

---

1. There is some discrepancy between the testimony of Diana Lantigua and her brother, Breidy, as to the payment of the trip. Diana states that she paid most of the expenses relating to the trip. Breidy alleged, on the other hand, that his father paid for the expenses. However, Officer Cruz did not use this discrepancy as a basis for referring the siblings to secondary inspection. (July 8, 2011 testimony of CBP Officer Denise Cruz, who originally determined to send the couple for a secondary inspection).

2. The Court infers by later testimony from another inspector that Diana Lantigua worked as an office janitor providing cleaning and maintenance services.

and signed a Customs and Inspection form stating that she traveled on a cruise ship to various Carribean Islands and was accompanied by another family member. Officer Alvarez was on one side of the secondary inspection room performing her duties as to Diana, while Officer Rivera, was on the other side of the room questioning Breidy Lantigua. Officer Rivera was at least three to four long aluminum inspection desks away from Officer Alvarez[3] with a middle corridor area for the general public in between each aluminum inspection desk.[4]

Officer Alvarez originally asked Diana Lantigua general questions and took notes based upon her answers. These notes were written on the reverse side of her Customs and immigration form.[5] Officer Alvarez asked questions related to the purpose of Diana's trip, such as whom she was traveling with and what kind of work did she perform. Diana Lantigua stated that she cleaned offices and took care of the elderly, all for a term of six days a week. Diana Lantigua also stated that her brother was 20 years old and was a high-school student.

Initially, however, Diana Lantigua stated that she wanted to leave as her "husband was waiting outside with [her] baby." The Court specifically inquired about why she was referred to secondary inspection. Officer Alvarez asked the same question to the referring agent, Officer Cruz, and was told that the "brother and sister were acting nervously. That was it."

Officer Alvarez asked Diana Lantigua if the two pieces of luggage were hers. One of the pieces was red and rectangular in shape, and the other piece was a blue/black duffle bag as seen in the photograph ( [Officer Alvarez testified that, in person, the duffle bag was actually black/grey in color]). Diana Lantigua also had a black purse (photograph I.D. number 12). Officer Alvarez had the following exchange with Diana Lantigua:

Question: Is this your luggage?

Answer: Yes.

Question: Did you pack everything yourself.

Answer: Yes.

Question: Are you carrying anything [other than for yourself] including packages?

Answer: No.

Officer Alvarez proceeded to inspect the piece of red luggage. The Officer first removed soiled clothes, then garlic cloves, followed by baby wipes. The baby wipes were smothered with a common room deodorant used to clean bathroom floors; this deodorant stained the wipes red with a cherry-like color. Officer Alvarez was very surprised and originally concerned that the red substance was blood. Officer Alvarez asked Diana Lantigua if she had cut herself and the Officer expressed to

---

3. Later, Officer Collazo offered a conflicting account stating that the siblings were next to each other in two adjacent inspection desks. However, the Court learned that Officer Collazo was in charge of the entire secondary inspection room, and had a variety of duties including calculating and collecting duties from the incoming passengers. Accordingly, the Court gives more weight and credibility to CBP inspectors Rivera's and Alvarez's version of the facts, who separately questioned Diana and Breidy for the majority of the time. Fur-

ther, Breidy was exclusively inspected by CBP Officer Rivera and thus Officer Collazo did not question Breidy when he was separated from Diana.

4. See photo entered into evidence (Exhibit 11).

5. Diana Lantigua later signed this inspection form, but not the Inspector's notes that referred to specific questions asked to each of the siblings.

the Court that "if it was blood, I did [sic] not want to touch it."

According to Officer Alvarez, Diana Lantigua responded, "No, no. It is deodorant ... it is room deodorant." Officer Alvarez later testified that "It was an alarm for us;" the Court later referred to this alarm as a "suspicion."

Officer Alvarez asked Diana Lantigua "Why do you have this here?" referring to the deodorant liquid which was almost pooling at the bottom of the suitcase/duffle bag. Officer Alvarez stated that Diana Lantigua "provided [ ] three different answers" to this question. First, Diana Lantigua stated, "I didn't know," but Officer Alvarez insisted on receiving an answer.[6] Next, Diana Lantigua replied that she decided to "purchase the deodorant in Aruba [because] it was very cheap." Finally, Diana Lantigua stated that somebody left it in her bag. [It was there in an empty bag.] These statements constitute the heart of the pending motion to suppress.

Officer Alvarez proceeded to open the duffle bag.[7] Officer Alvarez found mostly shoes with identical room deodorant spread on the bottom of the duffle bag along with black cloves, garlic cloves, and pieces of soap inside multiple pairs of shoes.

Officer Alvarez then asked, "Why do you have so many shoes?" Diana Lantigua did not answer. Diana Lantigua merely insisted on leaving the secondary inspection area because her husband was waiting outside with the baby.

In essence, Diana Lantigua seeks to suppress all of the statements she made after Officer Alvarez opened the initial piece of luggage and found the deodorant, cloves, and red colored baby wipes at the bottom of the luggage.

### III. CURRENT CASELAW

The issue in the instant case is whether the questions asked by Officer Alvarez to Diana Lantigua, within the confines of a border inspection, constituted "custodial questions" that should have triggered a prior *Miranda* warning under *Miranda v. Arizona*, 384 U.S. 436, 477–78, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This inquiry boils down to deciding "whether the circumstances of the encounter [ ] were of the 'nature and setting of ... [a] custody interrogation.'" *United States v. Pratt*, 645 F.2d 89, 90 (1st Cir.1981)(citing *Beckwith v. United States*, 425 U.S. 341, 346, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (quoting *Miranda*, 384 U.S. at 445, 86 S.Ct. 1602)).

Since *Pratt*, the First Circuit Court of Appeals has stated that "police are not required to give Miranda warnings to everyone they question." *Id.* (citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). This admonition has special application to airport Customs inspections and port vessels Customs inspections sites because individuals are aware of the greater necessity for an inspection at these locations and are accustomed to such routine inspection at these locations. *Delaware v. Prouse*, 440 U.S. 648, 657, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (Psychological impact of official intrusion lessened when "all are subject to a show of police power of the community"). Further, "any person required to submit to a secondary Customs search may apprehend *some increased level of suspicion.*"

---

**6.** Diana Lantigua previously stated at both the Motion to Suppress Hearing and at trial that she had packed her own bag and had not carried anything in her bag for anyone else.

**7.** At one point during her testimony, Officer Alvarez hesitated as to which bag was inspected first. However, at any rate, Officer Alvarez insisted that the bottom of both bags were covered with the liquid deodorant.

*Pratt,* 645 F.2d at 90 (citing *United States v. Henry* 604 F.2d 908 (5th Cir.1979)(emphasis added)).

The *Pratt* Court then concluded that the "confining character of a customs questioning cell, combined with isolation with two probing inspectors, also creates an oppressive atmosphere [which cannot be] ignore[d]." *Pratt,* 645 F.2d at 90. Nevertheless, the Court found that even questions in a cell, in the presence of two officers, are not, per se, illegal. The Court held that the other factors presented caused an override of the cell questioning. Specifically, the Court found three factors to be determinative, as modified by later First Circuit jurisprudence.[8]

The Court deems pertinent to examine the cases of *United States v. Ventura,* 85 F.3d 708 (1st Cir.1996), ("*Ventura I* ") and *United States v. Fernandez–Ventura,* 132 F.3d 844 (1st Cir.1998)("*Ventura II* "), as the Court considers said cases outcome determinative to the present inquiry.[9]

In *Ventura I,* the Court stated that the ultimate "inquiry" as to the need for a Miranda warning "is whether there was a formal arrest or restraint of freedom of movement of the degree associated with a formal arrest." 85 F.3d at 710 (internal citations omitted). In order to assess an individual's restraint on their freedom of movement, the Court must, objectively, examine all the circumstances surrounding the interrogation. "The only relevant inquiry is "how a reasonable man in the suspect's shoes would have understood his situation. The subjective beliefs held by the interrogating officers or the person interrogated are not germane." *Id.* (internal citations omitted) (citing *Stansbury v. Cal.,* 511 U.S. 318, 324–325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)(*per curiam* )((police officer's subjective intent is irrelevant to whether suspect is in custody for Miranda purposes; "one cannot expect the person under interrogation to probe the officer's innermost thoughts"); *see also United States v. Ellison,* 632 F.3d 727, 729 (1st Cir.2010) (following the same proposition as *Stansbury* ).

Pursuant to *Ventura I,* "[r]elevant circumstances include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Ventura I,* 85 F.3d at 711 (citing *United States v. Masse,* 816 F.2d 805, 809 (1st Cir.1987))(internal quotations and citations omitted).

The First Circuit has provided additional gloss on Customs interrogations in border-type inspections: "Indeed in the Cus-

---

**8.** At that time, the test was whether there existed a limited "questioning," a "routine questioning," and a short duration of the questioning encounter. There is, however, no single determinative factor. *Pratt,* 645 F.2d at 90.

**9.** *Nota Bene:* The Court must stress that Congressional statute expressly authorizes that all passengers may be sent to secondary inspection. 19 U.S.C. § 1582. Furthermore, "there is no probable cause required for the Customs Service to detain a traveler for a secondary inspection." *United States v. Galloway,* 316 F.3d 624, 629–630 (6th Cir.2003) (citing *United States v. Ramsey,* 431 U.S. 606, 619, 97

S.Ct. 1972, 52 L.Ed.2d 617 (1977). The power to search is vested in the voluntariness of the travelers' attempt to re-enter the country.

Moreover, the *Galloway* Court found that the U.S. Customs Service had developed a program called Compliance Examination (COMPEX), in which travelers are selected at random, based upon no suspicion whatsoever, for secondary inspection. The *Galloway* Court further stated that while Customs unquestionable possesses this authority, not every passenger was subjected to a secondary inspection merely due to budgetary constraints. *Galloway,* 316 F.3d at 629.

toms context we have stated that questions from officials are specifically understood to be necessary and important routine for travelers arriving at American entry points. This understanding cuts against the potential coercive aspect of the Customs inquiry and lessens the need for Miranda warning." *Ventura I,* 85 F.3d at 711 (citing *Pratt,* 645 F.2d at 90 and *United States v. Moya,* 74 F.3d 1117, 1120 (11th Cir.1996)); *see also Ventura II,* 132 F.3d at 846.

Finally, citing *Pratt,* even secondary inspection does not, per say, constitute custodial interrogation. Yet, the First Circuit has acknowledged that although "[a]ny person required to submit to a secondary Customs search may apprehend some increased level of official suspicion ... this perception ... is not sufficient by itself to apply coercive pressures equivalent to custodial questioning." *Ventura I,* 85 F.3d at 711 (*quoting Pratt* at 645 F.2d at 90); *see also United States v. Kiam,* 432 F.3d 524, 530 (3d Cir.2006) (" 'We fail to see how going directly to secondary inspection [and skipping primary inspection] makes the questioning more coercive.' ") (*quoting Ventura II,* 132 F.3d 844, 847). The Court additionally clarified that the customs and immigrations inspectors are unquestioningly authorized by statute to send all passengers to secondary inspection without any cause, as expressed by the Supreme Court in *United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). The First Court further clarified that "custodial interrogation [s] [occur when] the police should know [that the interrogations] are reasonably likely to elicit an incriminating response from the suspect." *Ventura I* (citing *Rhode Island v. Innis,* 446 U.S. 291, 301,

100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnotes omitted). Recapitulating, the Court stated in *Ventura I* that:

> To find custodial interrogation, the court must first examine all the circumstances surrounding the exchange between the government agent and the suspect, then determine from the perspective of a reasonable person in the suspect's shoes whether there was 1) a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest and 2) express questioning or its functional equivalent.

> We will not dwell on all the problems in the district court's version of the Miranda inquiry, but point out a few significant errors. First, the court took the ultimate factual and legal question—were defendants in custody?—and treated it in a per se manner: because travelers 'may not simply walk away from an interrogating officer,' they are in custody. This is simply wrong. Individuals subject to routine traffic stops or customs inspections, circumstances which are not custodial, are rarely free to leave while being questioned by an officer. The relevant inquiry, however, as stated above, is whether there was an arrest or restraint on freedom of movement of the degree associated with a formal arrest.

85 F.3d at 712.[10]

Recently in *United States v. Ellison,* in an opinion by Associate Justice Souter, sitting in the First Circuit by designation, the First Circuit stated that "custody under Miranda means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of Miranda." 632 F.3d 727, 729 (1st Cir.2010).

---

**10.** The First Circuit proceeded to vacate the district court's suppression order of detention, which was cited as an authority by De-

fendant in the instant matter. 892 F.Supp. 362 (D.P.R.1995).

We next turn to *Ventura II*.[11] 132 F.3d 844. Once again, the First Circuit Court stressed that, "the most significant circumstance is that the incident occurred in the course of a Customs inspection of the nations border ... and whether the interrogation is custodial must take into account the strong governmental interests in controlling our borders." *Ventura II*, 132 F.3d at 846 (citing *Moya* 74 F.3d at 1119). In *Ventura I*, the Court stated that "[q]uestions from Customs officials are specially understood to be a necessary and important routine for travelers arriving at American entry points. This understanding cuts the potential coercive aspects of the customs inquiry and lessens the need for Miranda warnings." 85 F.3d at 711. Two years later, in *Ventura II*, the Court took this notion a step further stating that " 'events which might be enough to signal custody away from the border will not be enough to establish custody in the context of entry into the country.' " 132 F.3d at 847 (quoting *Moya*, 74 F.3d at 1120).

Reversing the district court, the First Circuit additionally found that four customs officials with an individual in the context of a border search was not, per se, coercive in nature or constituted an arrest. "There were four officers with the defendants at all times two of whom were armed." *United States v. Ventura*, 947 F.Supp. 25, 29 (D.P.R.1996). However, the officers were not present simultaneously. *Ventura II*, 132 F.3d at 847. In *Pratt*, the First Circuit found that two officers present in a cell was not coercive, per se, in a border search atmosphere. 642 F.3d at 90. The Court further stressed in *Ventura II* that "it could not infer that travelers were in custody because they were not free simply to walk away from Customs inspectors." 132 F.3d at 847; *see also United States v. Ellison*,

632 F.3d at 729 (identical analysis by Justice Souter, sitting by designation)(discussed infra).

Additionally, with other routine circumstance, an hour and 20 minute questioning session was found not to be coercive. The *Pratt* Court determined that 17 and 20 minute interrogations were not custodial in nature. 645 F.2d at 91. Post-*Pratt*, factors now include, the totality of circumstances, the number of officers, the duration of the interrogation, and whether questions were limited and routine. The Circuit Court clarified that "the duration of the encounter is 'never a singly determinative factor.' " *Ventura II*, 132 F.3d at 848 (quoting *Pratt*, 645 F.2d at 91).

The Court also reviews specific cases as the defense's request. We first examine the case of *United States v. Torres Ramirez*, 696 F.Supp.2d 246 (E.D.N.Y.2010), which does not really aid the defendant. *Torres Ramirez*, in relevant part, states:

'Only where a border crossing interrogation has as its purpose the gathering of evidence for a future criminal prosecution is a Miranda warning required.' *United States v. FNU LNU*, 261 F.R.D. 1, 3 (E.D.N.Y.2009) (citing *Moody*, 649 F.2d at 127–28 (holding that where, upon finding a substance described as a 'caked talcum powder' on the person of an entrant to the United States, customs agent's question about the nature of the substance was for the purpose of obtaining evidence for a future criminal prosecution and Miranda warnings were required)). 'That a defendant's responses to questions asked as part of a border crossing inquiry may ultimately have some evidentiary value for a future criminal prosecution does not by itself trigger Miranda.' *FNU LNU*, 261 F.R.D. at 3 (citing *United States v. Mil-*

---

**11.** Curiously, *Ventura II*, was not cited by either party.

*ler*, No. 08–CR–860, 2009 WL 2182382, at *9, 2009 U.S. Dist. LEXIS 62396, at *24 (E.D.N.Y. July 21, 2009)).

*Ramirez*, 696 F.Supp.2d at 254.

█ The Court also reviews *United States v. Whitehead*, which addresses the right to remain silent. 200 F.3d 634 (9th Cir.2000). However, there is no right to remain silent at the border as to routine and limited questions. Such questions are expressly authorized in a line of cases from *Pratt*, 645 F.2d 89, to *Ventura II*, 132 F.3d at 844. Hence, silence is not a right within Customs and/or immigration border encounters. Further, "[a] person seeking entry into the United States does *not* have a right to remain silent." *United States v. Long Tong Kiam*, 432 F.3d 524, 529 (3d Cir.2006) (quoting *United States v. Gupta*, 183 F.3d 615 (7th Cir.1999)(emphasis in the original)).

Finally, Defendant requested the Court to examine the previously cited case of *United States v. Ventura*, 947 F.Supp. 25 (D.P.R.1996). The Court declines Defendant's invitation to do so as this case was expressly reversed by *Ventura II*.

## IV. ANALYSIS

█ The Court originally had a strong intuition that once the Customs officers had a suspicion of illegal conduct, and asked questions at a secondary inspection related to that suspicion, the questions, per se, reached the threshold of a custodial interrogation necessitating a Miranda warning. However, the Court concedes that its original inclination was misguided as "increased official suspicion is not sufficient by itself to apply coercive pressures equivalent to custodial questioning" at secondary inspection. *Pratt*, 645 F.2d at 90.

The Court proceeds to apply the factors illuminated in the aforementioned First Circuit jurisprudence. The Court borrows the first factor from *Pratt*, 645 F.2d at 90–91. Were the questions limited? Here, the questions may be fact specific, as was the case in *Pratt* where the Officer asked "why appellant possessed a ticket receipt in the name of another." Specific inquiries, such as that one, are not, per se, incriminating, nor do such questions lead to "obtaining evidence for further criminal prosecution." *Torres Ramirez*, 696 F.Supp.2d at 254 (citing *United States v. Moody*, 649 F.2d at 127). In the instant case, the questions were all limited; Officer Alvarez's questions related to the liquid deodorant inside both bags, the garlic, cloves and the high number of shoes, etc.

Secondly, we examine whether the question were routine in nature. Again, this is a fact specific inquiry. Officer Alvarez's questions typify routine questions. She asked, *inter alia*, "Are those your bags?" "Did you pack them?" and "You carrying a package for another?" "The purpose of the trip?" "And who is with you?" These questions were limited and content specific to what was found inside the bags. As in *Pratt*, 645 F.2d at 91, no contraband had yet been found when these question were asked. These questions were limited in nature and routine; Officer Alvarez's questions were not custodial questions made in preparation for a criminal trial.

Further, as in *Pratt*, the Customs Officer did not pat down Diana Lantigua nor was Diana Lantigua handcuffed when the questions were asked. However, in *Pratt*, the defendants were placed in a cell prior to the utterance of the statements and the Court determined that those statements were not coercive.

The Court also notes that Officer Alvarez testified that approximately five to ten minutes had elapsed from when Diana Lantigua was sent to secondary inspection to when Officer Alvarez asked about the deodorant liquid in Diana Lantigua's suit-

case. Thus, as in *Pratt* where the secondary inspection lasted approximately fifteen minutes, the duration of the encounter "supports a characterization of routine customs inquiry rather than custodial interrogation." *Pratt*, 645 F.2d at 91.

Finally, the Court scrutinizes whether the Defendant was actually in custody, taking into consideration that the test is not the lack of freedom to go away. 'Lack of freedom to go away,' within a Customs interrogation or a routine traffic stop, does not constitute custodial circumstances. Citizens are rarely free to leave while being questioned by an officer. Instead, the relevant inquiry is if, at the time of the questions as to the deodorant on the floor of the bags, the spice clove garlic, the baby swipes full of deodorant, there was, in fact, an arrest; that is a restraint of freedom of the movement of the degree associated with a formal arrest of Diana Lantigua. We think not. As previously mentioned, Diana Lantigua was not in handcuffs at that point nor had Officer Alvarez yet discovered any drugs, or drug residue, within the shoes.

Upon examining these factors, and balancing the interests of protecting the nation's borders, the Court, concludes that all questions by Officer Alvarez, up to and including questions relating to the liquid deodorant, the garlic cloves, large number of shoes, and/or different sizes of shoes, do not reach the threshold of custodial interrogation within a border inspection under *Miranda v. Arizona*, 384 U.S. at 477–78, 86 S.Ct. 1602. The Court clarifies that the challenged questions were all asked prior to the dog identifying the presences of contraband within the suitcases and prior to the CBP officers' discovery of the contraband within the shoes.

However, the Court will eliminate from the jury's consideration evidence as to Officer Alvarez's opinion that Diana Lantigua was evading her last several questions. While Officer Alvarez's observational opinion is admissible, it is more properly excluded as being unfairly prejudicial under Rule 403 of the Federal Rules of Evidence's balancing test.

**IT IS SO ORDERED.**